2024-1201

**United States Court of Appeals**
**For the Federal Circuit**

**ESCAPEX IP, LLC,**

*Plaintiff-Appellant*

**v.**

**GOOGLE LLC,**

*Defendants-Appellee*

Appeal from the United States District Court for the Northern District of California in No. 3:22-cv-08711-VC, Judge Vince Chhabria.

CORRECTED BRIEF OF
ESCAPEX IP, LLC

Attorneys for Appellants:

Ramey LLP

/s/ William P. Ramey, III
William P. Ramey, III
Texas Bar No. 24027643
wramey@rameyfirm.com
5020 Montrose Blvd., Suite 800
Houston, Texas 77006
(713) 426-3923

**The ’113 Patent:**

1. A computer implemented method for updating a dynamic album that includes a set of songs stored in relation to and played by an artist specific application associated with an artist, the method being implemented on a user device having one or more physical processors programmed with computer program instructions that, when executed by the one or more physical processors, cause the user device to perform the method, the method comprising: receiving, by the user device, one or more album parameters that specify a change to be made to the dynamic album that includes a plurality of songs, wherein the dynamic album is stored via information encoding the plurality of songs at the user device in association with the artist specific application that plays the dynamic album at the user device; accessing, by the user device, the information encoding the plurality of songs responsive to receipt of the one or more album parameters; modifying, by the user device, the information encoding the plurality of songs based on the one or more album parameters to change the dynamic album without intervention by a user of the user device; storing, by the user device, the modified information encoding the plurality of songs at the user device; and playing, by the user device, at least some of the dynamic album through the artist specific application based on the modified information encoding the plurality of songs at the user device.

2. The method of claim 1, wherein the one or more album parameters originate from the artist associated with the artist specific application to change the dynamic album for users that have installed the artist specific application.

3. The method of claim 1, wherein the information encoding the plurality of songs is integrated with an executable file associated with the artist specific application

4. The method of claim 1, wherein the one or more album parameters specify a new song to be added to the dynamic album, the method further comprising: receiving information that encodes the new song, wherein modifying the information encoding the plurality of songs comprises re-encoding the information encoding the plurality of songs such that the new song is included in the dynamic album.

5. The method of claim 1, wherein the one or more album parameters specify a song to be removed from the dynamic album, the method further comprising: omitting the song to be removed during playback of the dynamic album

6. The method of claim 5, wherein omitting the song to comprises deleting the song.

7. The method of claim 5, wherein omitting the song comprises updating an indicator associated with the song to be removed to indicate that the song should not be played in association with the dynamic album.

8. The method of claim 1, wherein the one or more album parameters specify a song to be replaced with a replacement song, the method further comprising: causing the replacement song to be played instead of the song to be replaced during playback of the dynamic album.

9. The method of claim 8, wherein the replacement song comprises a different version of a song to be replaced.

10. The method of claim 1, wherein the one or more album parameters specify a reshuffling of the dynamic album, the method further comprising: changing an order in which the plurality of songs of the dynamic album is played based on the one or more album parameters.

11. The method of claim 1, wherein the plurality of songs is playable at the user device through only the artist specific application.

12. The method of claim 1, wherein the dynamic album is subject to a music lease that, when expires, renders the dynamic album unplayable, the method further comprising: determining whether the music lease has been expired; and rendering the dynamic album unplayable responsive to a determination that the music lease has expired.

13. The method of claim 1, the method further comprising: initiating playback of the dynamic album upon initiation of the artist specific application.

14. A system for updating a dynamic album that includes a set of songs stored in relation to and played by an artist specific application associated with an artist, the system comprises: a user device comprising one or more physical processors programmed with computer program instructions that, when executed by the one or more physical processors, cause the user device to: receive one or more album parameters that specify a change to be made to the dynamic album that includes a plurality of songs, wherein the dynamic album is stored via information encoding the plurality of songs at the user device in association with the artist specific application that plays the dynamic album at the user device; access the information

encoding the plurality of songs responsive to receipt of the one or more album parameters; modify the information encoding the plurality of songs based on the one or more album parameters to change the dynamic album without intervention by a user of the user device; store the modified information encoding the plurality of songs at the user device; and play at least some of the dynamic album through the artist specific application based on the modified information encoding the plurality of songs at the user device.

15. The system of claim 14, wherein the one or more album parameters originate from the artist associated with the artist specific application to change the dynamic album for users that have installed the artist specific application.

16. The system of claim 14, wherein the information encoding the plurality of songs is integrated with an executable file associated with the artist specific application.

17. The system of claim 14, wherein the one or more album parameters specify a new song to be added to the dynamic album, the user device further programmed to: receive information that encodes the new song, wherein modifying the information encoding the plurality of songs comprises re-encoding the information encoding the plurality of songs such that the new song is included in the dynamic album.

18. The system of claim 14, wherein the one or more album parameters specify a song to be removed from the dynamic album, wherein the user device is further programmed to: omit the song to be removed during playback of the dynamic album.

19. The system of claim 18, wherein to omit the song, the user device is further programmed to delete the song.

20. The system of claim 18, wherein to omit the song, the user device is further programmed to: update an indicator associated with the song to be removed to indicate that the song should not be played in association with the dynamic album.

21. The system of claim 14, wherein the one or more album parameters specify a song to be replaced with a replacement song, the user device further programmed to: cause the replacement song to be played instead of the song to be replaced during playback of the dynamic album

22. The system of claim 20, wherein the replacement song comprises a different version of a song to be replaced.

23. The system of claim 14, wherein the one or more album parameters specify a reshuffling of the dynamic album, wherein the user device is further programmed to: change an order in which the plurality of songs of the dynamic album is played based on the one or more album parameters.

24. The system of claim 14, wherein the plurality of songs is playable at the user device through only the artist specific application.

25. The system of claim 14, wherein the dynamic album is subject to a music lease that, when expires, renders the dynamic album unplayable, wherein the user device is further programmed to: determine whether the music lease has been expired; and render the dynamic album unplayable responsive to a determination that the music lease has expired.

26. The system of claim 14, wherein the user device is further programmed to: initiate playback of the dynamic album upon initiation of the artist specific application.

27. A computer implemented method for receiving commands from an artist to update a dynamic album at a user device that includes a set of songs stored in relation to and played by an artist specific application associated with the artist, the method being implemented on a computer system having one or more physical processors programmed with computer program instructions that, when executed by the one or more physical processors, cause the computer system to perform the method, the method comprising: receiving, by the computer system, from the artist, one or more commands that specify a change to be made to the dynamic album played at the user device through the artist specific application associated with the artist; generating, by the computer system, one or more album parameters used to change the dynamic album based on the one or more commands; and providing, by the computer system, the one or more album parameters to at least the user device remote from the computer system at which the artist specific application is installed, wherein the one or more album parameters cause the user device to change the dynamic album in association with the artist specific application without intervention by a user of the user device.

28. The method of claim 27, wherein providing the one or more album parameters to the user device comprises: identifying the user device based on identifying

information used to identify the user device, wherein the one or more album parameters are provided based on the identification.

29. The method of claim 28, wherein the identifying information comprises a user account identifier that is associated with the user device.

30. The method of claim 27, wherein the one or more album parameters is provided to the user device responsive to a communication received from the first user device.

## CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4(a) and Federal Rule of Appellate Procedure 26.1, counsel for Appellant EscapeX IP, LLC ("EscapeX") certifies the following:

1. The full name of every party represented by the undersigned is EscapeX IP, LLC.

2. None/Not Applicable

3. None/Not Applicable

4. The names of all law firms and the partners or associates that appeared for EscapeX IP, LLC in the district court or are expected to appear in this Court are:

William P. Ramey, III
Susan Kalra
Ramey LLP

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. See Fed. Cir. R. 47. 4(a)(5) and 47.5(b).

1. None/Not Applicable

Date: May 6, 2024

/s/ William P. Ramey, III
William P. Ramey, III

## TABLE OF CONTENTS

STATEMENT OF RELATED CASES ........................................................ 1
STATEMENT OF JURISDICTION ........................................................ 1
ISSUES PRESENTED ........................................................ 2
STATEMENT OF THE CASE ........................................................ 3
STATEMENT OF RELEVANT FACTS ........................................................ 4
SUMMARY OF ARGUMENT ........................................................ 7
STANDARD OF REVIEW ........................................................ 12
ARGUMENT ........................................................ 13
I. THE DISTRICT COURT ABUSED ITS DISCRETION IN FINDING THE CASE EXCEPTIONAL AND AWARDING FEES UNDER §285 .............. 13
A. The District Court's Order ........................................................ 13
B. EscapeX conducted an Adequate Pre-Suit Investigation ......................... 15
C. Google's Letters Were Attorney Argument ............................................ 20
D. EscapeX Does Not File Frivolous Suits ................................................ 23
E. There is Nothing Inherently Improper About Being a Non-Practicing Entity that Settles Cases for Money ........................................................ 24
F. Under the Case Law from this Court, the Case is not Exceptional .......... 28
II. THE COURT ERRED IN DENYING THE MOTION TO AMEND .......... 31
III. THE SANCTIONS UNDER 28 U.S.C. §1927 SHOULD BE REVERSED ........................................................ 34
A. The Ninth Circuit Requires a Finding of Subjective Bad Faith ............... 35
B. The District Court's Sanction Order ........................................................ 36
C. The Record in This Case Was Lacking .................................................. 37
IV. GOOGLE'S EXPECTED RESPONSE ........................................................ 41
CONCLUSION AND RELIEF SOUGHT ........................................................ 43

## TABLE OF AUTHORITIES

**Cases**

*AdjustaCam, LLC v. Newegg, Inc.*, 861 F.3d 1353 (Fed. Cir. 2017)........................27

*Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633 (Fed. Cir. 2015) ..........................25

*Bayer CropScience AG v. Dow AgroSciences LLC,* No. 12-256, 2015 WL 1197436 (D. Del. Mar. 15, 2015), aff'd, 851 F.3d 1302 (Fed. Cir. 2017).........20

*Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683 (Fed. Cir. 2008).......................25

*Browning v. Kramer*, 931 F.2d 340 (5th Cir.1991) ................................................36

*Caputo v. Tungsten Heavy Powder, Inc.*, 96 F.4th 1111 (9th Cir. 2024)........................................................................ 36, 37, 39, 40

*Chambers v. NASCO, Inc.,* 501 U.S. 32, 44, 111 S. Ct. 2123, 115 L.Ed.2d 27 (1991)...........................................................................................................35

*Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*, 858 F.3d 1371 (Fed. Cir. 2017)....................................................................... 20, 26, 29, 30

*Continental Paper Bag Co. v. Eastern Paper Bag Co.*, 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed. 1122 (1908).......................................................................25

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006)...................................................................................25

*Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314 (Fed. Cir. 2011).........................26

*EscapeX IP LLC v. Block, Inc.,* 652 F. Supp. 3d 396, 408–09 (S.D.N.Y. 2023) ......3

*Est. of Blas Through Chargualaf v. Winkler*, 792 F.2d 858 (9th Cir. 1986)...........13

*Evans v. Jeff D.*, 475 U.S. 717, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986) ................27

*Fogerty v. Fantasy, Inc.,* 510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994)...........................................................................................................28

*Gomez v. Vernon*, 255 F.3d 1118 (9th Cir. 2001)..................................................36

*Gust, Inc., v. Alphacap Ventures, LLC*, 905 F.3d 1321 (Fed. Cir. 2018)............................................................................. 24, 31, 41

*Hemmings v. Tidyman's Inc.*, 285 F.3d 1174 (9th Cir. 2002).................................13

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.,* 572 U.S. –559, 134 S.Ct. 1744, 188 L.Ed.2d 829 (2014)....................12

*In re Keegan Management Co.,* 78 F.3d 431 (9th Cir.1996)....................35

Insite Vision Inc. v. Sandoz, Inc., 783 F.3d 853 (Fed. Cir. 2015)....................13

*King Instruments Corp. v. Perego*, 65 F.3d 941 (Fed. Cir. 1995)....................26

*Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337 (Fed. Cir. 2018)....................19

*New Alaska Dev. Corp. v. Guetschow,* 869 F.2d 1298 (9th Cir.1989)....................35

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 134 S. Ct. 1749, 1756, 188 L. Ed. 2d 816 (2014).................... 28, 29

*Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360 (Fed. Cir. 2017)....................27

*Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538 (Fed. Cir. 1995)....................25

*Sch. Dist. No. 1J, Multnomah Cnty., Or. v. ACandS, Inc.*, 5 F.3d 1255 (9th Cir. 1993).................... 32, 38

*SFA Sys., LLC v. Newegg Inc.*, 793 F.3d 1344 (Fed. Cir. 2015)....................26

*Stitt v. Williams,* 919 F.2d 516 (9th Cir.1990)....................35

*Thermolife Int'l LLC v. GNC Corp.*, 922 F.3d 1347 (Fed. Cir. 2019).................... 19, 25, 29, 30, 33

*Trulis v. Barton*, 107 F.3d 685 (9th Cir. 1995)....................35

**Constitutional Provisions & Statutes**

28 U.S.C. § 1295....................1

28 U.S.C. § 1404(a)....................4

28 U.S.C. § 1927.................... 1, 4, 6, 35

35 U.S.C. § 101....................9

35 U.S.C. § 285.................... 1, 4, 5, 6

**Rules & Regulations**

Fed. R. App. P. 26.1.................... vii

Fed. R. App. P. 32(a)(7)(B)....................45

Fed. R. Civ. P. 41(a)(1)(A)(ii) ....................................................................................5

## TABLE OF ABBREVIATIONS

***Parties***

| | |
|---|---|
| Plaintiff/Appellant | EscapeX IP, LLC |
| Defendant/Appellee | Google LLC |

***Patents-in-Suit***

| | |
|---|---|
| The ’113 patent | U.S. Patent 9,009,113 (“Patent-in-Suit”) |

***Defined Terms***

| | |
|---|---|
| District Court | United States District Court for the Northern District of California, the Honorable Judge Vince Chhabria |
| Court of Appeals | United States Court of Appeals for the Federal Circuit |
| Asserted Claims | Claims 1, 14, 17, 27, 28, and 29- 12 of the ’113 patent |

All emphasis in this brief is added unless otherwise indicated.

## STATEMENT OF RELATED CASES

Each of the consolidated cases has been on a previous appeal:

1. *None.*

The following cases are known to be pending in courts that will directly affect or be directly affected by this Court's decision in the pending appeal:

1. *None.*

## STATEMENT OF JURISDICTION

The District Court has jurisdiction per 28 U.S.C. §§ 1331, 1338(a), and 1367 and this Court has appellate jurisdiction per 28 U.S.C. § 1295 for all consolidated cases.

This Appeal is an appeal of a two fee awards under 35 USC §285 and 28 U.S.C. §1927.[1]

EscapeX timely filed a Notice of Appeal on November 27, 2023.[2] An amended notice of appeal was filed on February 12, 2024.[3]

[1] Appx0001 and Appx0004.
[2] Appx0593.
[3] Appx0740.

## ISSUES PRESENTED

1. Was it an abuse of discretion for the District Court to find this case exceptional and award fees under 35 U.S.C. §285 where the entire record for the case, outside of the pleadings, came from the briefing on Google's First Motion for Fees? Are due process concerns adequately addressed when a district court judge decides a sanction motion on an incomplete record?
2. Was it an abuse of discretion to deny a motion to amend the judgment when the motion brings forward evidence not previously considered by the district court and where that court discounted other evidence probative on the issue of whether a case was exceptional? Are due process concerns adequately addressed when a district court judge decides a motion for sanctions on an incomplete record when that court is given the opportunity to supplement the record though a motion to amend the judgment that provides evidence not previously considered by that court?
3. **3.** Was it an abuse of discretion to award fees against EscapeX's lawyers under 28 U.S. §1927? Did counsel for EscapeX knowingly or recklessly raise a frivolous argument? Were the actions of EscapeX's counsel in bad faith or tantamount to bad faith or should EscapeX's counsel have declined its client's request to file a motion to amend the judgment when that motion

sought to present evidence not considered by the District Court and relevant on the issue of sanctions?

## STATEMENT OF THE CASE

This is an appeal of an award of fees under 35 U.S.C. §285 and 28 U.S.C. §1927 from a patent infringement case where EscapeX IP, LLC ("EscapeX") alleged infringement of claims from United States Patent No. 9,009,113 ("the '113 patent") ("the Asserted Patent") by Google LLC. After EscapeX amended its complaint, Google answered without counterclaims and without a motion to dismiss.[4] The case was then transferred to the Northern District of California to the court of the Honorable Haywood S. Gilliam, Jr. after EscapeX did not oppose a motion to transfer under §1404.

In another case concerning allegations of infringement of the '113 patent, on January 24, 2023, the Honorable Jesse M. Furman of the Southern District of New York found the claims of the '113 patent invalid as directed towards patent ineligible subject matter.[5]

On March 7, 2023, the present case was dismissed.[6] On June 16, 2023, Judge Gilliam recused himself and the case was reassigned to the Honorable Vince

---

[4] Appx0102.
[5] *EscapeX IP LLC v. Block, Inc.*, 652 F. Supp. 3d 396, 408–09 (S.D.N.Y. 2023).
[6] Appx0143.

Chhabria.[7] No merits decision of any motion was decided by the District Court except and prior to the motions for sanctions under 35 U.S.C. §285 and 28 U.S.C. §1927. Consequently, the record before the District Court was limited to the record from the briefing of the sanctions' motions. The District Court that ruled on the sanctions motions was only assigned the case after the case was closed and the briefing on the §285 motion was complete.

## STATEMENT OF RELEVANT FACTS

On April 28, 2022, Plaintiff EscapeX IP LLC sued Google LLC for infringing its U.S. Patent No. 9,009,113 ("the '113 patent"). EscapeX filed a First Amended Complaint on May 23, 2022, and a Second Amended Complaint on September 29, 2022.[8] Google filed an Answer to a Second Amended Complaint on October 17, 2022.[9] Notably, the First Amended Complaint and the Second Amended Complaint are nearly identical.[10]

On November 21, 2022, Google filed a Motion Under 28 U.S.C. § 1404(a) to Transfer Venue to the Northern District of California Appx00109. This Motion was not opposed, leading to this case being transferred to the Northern District of California on December 11, 2022.[11]

[7] Appx0477.
[8] Appx0093.
[9] Appx0102.
[10] *Compare* Appx0072 and Appx0078 with Appx0093 and Appx0098.
[11] Appx0134.

In a separate case, *EscapeX IP LLC v Block, Inc.*, 22-CV-3575 (JMF) (S.D.N.Y. Aug. 8, 2022), the '113 patent was invalidated as not being patent eligible under Section 101 of the Patent Act ("Opinion" Dkt. No. 30 for case no. 22-CV-3575). The Opinion, spanning 19 pages, provided a detailed and intricate analysis, underscoring the complexity of the matter and refuting any notion of frivolousness.

On March 3, 2023, EscapeX filed a Joint Stipulation of Dismissal, which erroneously stated that each party shall bear its own costs, expenses and attorneys' fees.[12] However, on the very same day, the Joint Stipulation of Dismissal was withdrawn.[13] Nonetheless, even though the erroneous Stipulation of Dismissal was immediately withdrawn, Google alleged that the errors on the Stipulation of Dismissal somehow demonstrates fees are warranted.[14] The parties subsequently filed a Joint Stipulation of Dismissal Pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) on March 7, 2023, resulting in the case's dismissal.[15]

On March 21, 2023, Google filed its Motion for Attorneys' Fees under 35 U.S.C. §285.[16] Plaintiff responded to Google's Motion for Fees on April 19, 2023.[17]

---

[12] Appx0137.
[13] Appx0141.
[14] Appx0147 at Appx0155-Appx0156.
[15] Appx0143.
[16] Appx0147.
[17] Appx0422 and Appx0437, Appx0440, Appx0450, Appx0462.

On June 16, 2023, Judge Gilliam recused himself and the case was reassigned to Judge Chhabria.[18]

On August 16, 2023, the District Court granted Google's Motion for fees.[19]

On September 13, 2023, EscapeX filed a Motion to Amend the Judgment[20] which was denied on October 30, 2023.[21]

On November 13, 2023, Google filed a Second Motion for Attorneys' Fees Pursuant to 35 U.S.C §285, 28 U.S.C. §1927, and the Court's Inherent Powers.[22] On December 4, 2023, EscapeX responded in opposition to the Second Motion for Fees.[23] On February 12, 2023, Judge Chhabria granted the Second Motion for fees and costs under 28 U.S.C. §1927 in the amount of $63,525.30, levied against EscapeX's attorneys William P. Ramey, III and Susan Kalra.[24] An amended notice of appeal was filed on February 12, 2024 that appealed:

• the Order Granting Motion for Attorneys' Fees Under 35 U.S.C. §285 on August 16, 2023;[25]

18 Appx0477.
19 Appx0001.
20 Appx0502.
21 Appx0003, October 30, 2023 Minute Entry.
22 Appx0550.
23 Appx0596.
24 Appx0727.
25 Appx0001.

• the minute Order denying Plaintiff's Motion to Amend the Judgment on October 30, 2023;[26] and,

• the Order Granting Motion For Attorneys' Fees Under 28 U.S.C. §1927 dated February 12, 2024.[27]

## SUMMARY OF ARGUMENT

EscapeX challenges the District Court's granting of a sanction under §285, the denial of a motion to amend the judgment and the granting of sanction under §1927.

First, the District Court abused its discretion in finding the case exceptional and awarding fees under §285. While the District Court found the case exceptional, warranting fees because:

1. of a lack of a pre-suit investigation;
2. Google sent a letter advising EscapeX that Google believed the '113 patent invalid and that EscapeX continued to press its suit even after it was invalidated in another court; and,
3. EscapeX and DynaIp have a history of bringing frivolous suits in an effort to force a modest settlement by pestering a tech giant,

[26] Appx0003.
[27] Appx0728.

the facts of the case show otherwise. The District Court issued its Order after it had been on the case for only two months and without deciding any other motion in the case. Further, the District Court did not consider all evidence before it. The District Court's Order only repeats Google's non-infringement position through Google's off the record letters to EscapeX.

The record evidence of EscapeX's actions upon receiving Google's August 5th letter was that EscapeX filed an amended complaint on September 29, 2022. The amended complaint alleged that Google's YouTube Video infringed the claims of the '113 patent. EscapeX's amended charts particularly alleged how Google's YouTube Video was ***an artist specific application*** that facilitates changes to a dynamic album that includes a plurality of songs. In response, Google stated that YouTube Video was not ***an artist specific application***. However, no court ever construed the claims and the District Court's wholesale adoption of Google's position cannot stand scrutiny because Google supplied a construed meaning without the benefit of claim construction. But more importantly, Google's statements are an admission that it believes that its product YouTube Video does not have ***an artist specific application*** as alleged by EscapeX. Therefore, YouTube Video could not have anticipated the '113 patent. There simply is no evidence to overcome the presumption that the lawsuit was filed in good faith.

Given the lack of a full record, EscapeX further detailed its pre-suit investigation through evidence submitted with a Motion to Amend the Judgment. Specifically, the evidence detailed the pre-suit investigation, that a technical resource researched YouTube Music and YouTube Video, and drafted a claim chart that verified infringement of certain claims of the '113 patent by Google. The technical resource's pre-suit investigation revealed that "Auto Add" was known prior to the priority date of U.S. Patent No. 9,009,113. However, YouTube's "Auto Add" that predated the '113 patent did not include the claimed "dynamic album ... in association with an artist specific application (ASA)."

Further, the only evidence before the District Court was that EscapeX was prepared to test the merits of its claims. EscapeX fought a motion to dismiss in another case, but lost when on January 24, 2023, Judge Furman invalidated the '113 patent under 35 U.S.C. § 101. After the invalidation, EscapeX evaluated its position and ultimately decided not to appeal. Less than three weeks later, EscapeX dismissed the case against Google. No action was taken by EscapeX in the case from January 24, 2024, until the case was dismissed, as the record shows.

The District Court cites no evidence from which to draw that EscapeX has a history of filing frivolous lawsuits or that it engaged in litigation misconduct, because there is none.

In this case, the District Court appears to base its exceptional case finding on its conclusion that the case was an effort to force a modest settlement by pestering a tech giant with a frivolous suit on the assumption that the tech giant will prefer to capitulate than fight back. However, such a finding, even if true, would not show misconduct on its own.

Here, in the underlying case, the party's litigation position was not developed and there are no facts to support that the case was litigated unreasonably, considering that EscapeX did not file an opposition to the motion to transfer and dismissed its case when another court found the '113 patent invalid. While this Court reviews for abuse of discretion, in part because of a district court's familiarity with the case, when that familiarity is not present or less, such as in this case, the deference to the District Court should likewise be less.

Second, the court erred in denying the motion to amend. EscapeX directed the motion to be filed because there were highly unusual circumstances that resulted in the manifest injustice of the granting of the Motion for Fees under §285. The motion included two declarations that were drafted in a way that the evidence was not evidence that had been considered before by the District Court, to more fully develop the record. The unusual circumstances included:

(1) the way in which the case arrived before the Distrcit Court;

(2) the lack of a fully developed record on the pre-suit investigation as Google only attacked the pleadings in its motion for fees;

(3) the lack by Google of any prior motion to dismiss where the merits of EscapeX's positions could be discussed; and,

(4) the length of time the case was pending before the Court.

A motion for sanctions should not be a "gotcha game" as this one became and a more complete record should be desired.

Third, the sanctions under 28 U.S.C. §1927 should be reversed. While it is true that a finding that the attorneys recklessly raised a *frivolous* argument which resulted in the multiplication of the proceedings can justify a § 1927 sanction. Here, the only evidence before the District Court was that abundant care was taken to consider the nature of the evidence being submitted with the Rule 59(e) Motion. The facts of this case are highly unusual in that no substantive decision on EscapeX's infringement position occurred prior to Google's Motion for Fees under 35 U.S.C. §285 ("Google's First Motion for Fees"). There simply was no record in this case other than what was briefed to the District Court in Google's First Motion for Fees. EscapeX defended its infringement position in response to Google's First Motion for Fees by providing that YouTube's "Auto Add" that predated the '113 patent did not anticipate the claims of the '113 patent, as admitted by Google,

because it did not have the artist specific application. It was not until after the ‘113’s filing date that an artist specific application was added.

To support sanctions, under Ninth Circuit precedent, the Rule 59(e) Motion and the two declarations would have to be baseless and made without reasonable and competent inquiry or made up of legal or factual contentions so weak as to constitute objective evidence of improper purpose, neither of which apply in this case. Bad faith should only be inferred from attorney action only if actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay. Here, the record does not support bad faith but rather the interests of justice.

## STANDARD OF REVIEW

A decision to award attorneys’ fees under 35 U.S.C. §285 is reviewed for abuse of discretion.[28] “The abuse-of-discretion standard does not preclude an appellate court's correction of a district court's legal or factual error.”[29] An abuse of discretion occurs when a district court's decision commits legal error or is based on a clearly erroneous assessment of the evidence.[30] “A factual finding is clearly erroneous if, despite some supporting evidence, we are left with the definite and

---

[28] *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.,* 572 U.S. –559, 563, 134 S.Ct. 1744, 1749, 188 L.Ed.2d 829 (2014).
[29] *Id.* at 563 n.2, 134 S.Ct. 1744.
[30] *Id.* at 1748 n.2.

firm conviction that a mistake has been made."[31]

The denial of a motion to amend a judgment is a procedural question not unique to patent law and thus is reviewed under the law of the regional circuit. In the Ninth Circuit, a denial of a motion to amend a judgment is reviewed for abuse of discretion.[32]

The grant of a sanction against attorneys pursuant to 28 U.S.C. § 1927 or a court's inherent power is a procedural question not unique to patent law and thus is reviewed under the law of the regional circuit. In the Ninth Circuit, a grant of sanction under 28 U.S.C. § 1927 and a court's inherent powers is reviewed for abuse of discretion.[33]

## ARGUMENT

### I. THE DISTRICT COURT ABUSED ITS DISCRETION IN FINDING THE CASE EXCEPTIONAL AND AWARDING FEES UNDER §285.

#### A. The District Court's Order

The stated basis for Judge Chhabria's Order awarding fees under Section 285 was:

---

[31] *Insite Vision Inc. v. Sandoz, Inc.*, 783 F.3d 853, 858 (Fed. Cir. 2015).
[32] *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1195 (9th Cir. 2002).
[33] *Est. of Blas Through Chargualaf v. Winkler*, 792 F.2d 858, 860 (9th Cir. 1986).

1. Because it was obvious that EscapeX conducted no serious pre-suit investigation and that the case was frivolous from the start because EscapeX amended its complaint and allegedly sued the prior art;[34]
2. that EscapeX had notice that it advanced a baseless lawsuit because Google sent a letter advising EscapeX that Google believed the '113 patent invalid and that EscapeX continued to press its suit even after it was invalidated in another court;[35] and,
3. that EscapeX and DynaIp have a history of bringing frivolous suits in an effort to force a modest settlement by pestering a tech giant.[36]

The District Court issued its Order after it had been on the case for only two months and without deciding any other motion in the case. Further, there is nothing in the District Court's Order that comments on EscapeX's infringement contentions that had been served and where part of the record for the Motion for fees.[37] Rather, the District Court's Order only repeats Google's non-infringement position through Google's off the record letters to EscapeX. However, it is not uncommon for a defendant to allege that it does not infringe. It is important to note that the case was in its infancy and had not progressed past the initial answer

[34] Appx0001 at 1.
[35] Appx0001 at 1-2.
[36] Appx0001 at 2.
[37] Appx0203.

by Google. Virtually no merits-based milestones had occurred except that Google apparently believed that EscapeX's complaint properly alleged infringement as it did not file a motion to dismiss.

**B. EscapeX conducted an Adequate Pre-Suit Investigation**

The only record evidence for the District Court of EscapeX's actions upon receiving Google's August 5th letter was that EscapeX filed an amended complaint on September 29, 2022.[38] The amended complaint alleged that Google's YouTube Video infringed the claims of the '113 patent. EscapeX's prior claim charts connected Google's YouTube Music product with functionality from Google's YouTube Video.[39] However, after Google's August 5th letter, EscapeX's charts detailed how each element of the claims is allegedly met by YouTube Video:

---

[38] Appx0093; Appx0098.

[39] Appx0078, *generally*.

| US9009113 B1 Claim 1 | YouTube Video |
|---|---|
| 1. A computer implemented method for updating a dynamic album that includes a set of songs stored in relation to and played by an **artist specific application associated with an artist**, the method being implemented on a user device having one or more physical processors programmed with computer program instructions that, when executed by the one or more physical processors, cause the user device to perform the method, the method comprising: |  <https://www.youtube.com/watch?v=-1pMMIe4hb4&list=PL3014BDDD936B0ED8><br><br>YouTube Video has a computer implemented method for updating a dynamic album that includes a set of songs stored in relation to and played by an artist specific application associated with an artist, the method being implemented on a user device having one or more physical processors programmed with computer program instructions that, when executed by the one or more physical processors, cause the user device to perform the method.<br><br>The reference includes subject matter disclosed by the claims of the patent after the priority date. |

[40]

The changes in the claim chart were very minor and amounted to a change in title from YouTube Music to YouTube Video.[41] EscapeX's amended charts particularly alleged how Google's YouTube Video was ***an artist specific application*** that facilitates changes to a dynamic album that includes a plurality of songs:

---

[40] Appx0093-1 at 2/4.

[41] *Compare* Doc. Appx0099 with Appx0079.

| US9009113 B1 Claim 1 | YouTube Video |
|---|---|
| receiving, by the user device, one or more album parameters that specify a change to be made to the **dynamic album that includes a plurality of songs**, wherein the dynamic album is stored via information encoding the plurality of songs at the user device in association with the **artist specific application that plays the dynamic album** at the user device; | <br><br><https://web.archive.org/web/20150726011321/https://support.google.com/youtube/answer/6083634><br><br>The reference describes receiving, by the user device, one or more album parameters that specify a change to be made to the dynamic album that includes a plurality of songs, wherein the dynamic album is stored via information encoding the plurality of songs at the user device in association with the artist specific application that plays the dynamic album at the user device [Playlists settings]. |

[42] In response, Google stated that YouTube Video was not ***an artist specific application***.[43] Google in fact alleged a construction of the term ***artist specific application*** based on which it alleged it did not infringe:

[42] Appx0093-1 at 3/4.
[43] Appx0192 at 4 (5/10).

Claim 1 (and every other independent claim) of the '113 patent requires a user device with an "artist specific application." The '113 patent describes an "artist specific application," or "ASA," as an application that "includes music and other content related to [an] artist." '113 patent at 4:56–58. The patent distinguishes an *artist specific* application from a single application that streams music from multiple artists:

> **Thus, instead of a single application that streams music from multiple artists, each ASA may relate to an individual artist.**

'113 patent at 4:62–64. YouTube Video is a single application that is capable of streaming videos from multiple artists. EscapeX's infringement chart uses a "Kate Bush playlist" as an example. Dkt. 15, Ex. A at 1. But one can just as easily stream videos from virtually any other artist; for example Taylor Swift:[44] As such, Google was construing the claims for its noninfringement position, at the pleading stage. However, no court ever construed the claims and the District Court's wholesale adoption of Google's position cannot stand scrutiny because Google supplied a construed meaning without the benefit of claim construction. But more importantly, Google's statements are an admission that it believes that its product YouTube Video does not have ***an artist specific application*** as alleged by EscapeX. Therefore, YouTube Video could not have anticipated the '113 patent as Google's own statements allege that it did not practice all of the claim elements.[45] For the District Court to find otherwise on only Google's letters illustrates why

[44] Appx0238 at 4 (5/10).
[45] EscapeX believes Google YouTube Video product later incorporated the features of an artist specific application and does infringe the claims of the '113 patent.

deciding the merits of positions during a motion for fees deserves less deference from this Court.[46]

EscapeX made this point to the District Court in its response to the Motion for Attorneys' Fees under Section 285:

> The remainder of Google's August 5, 2022 letter raises additional arguments as to why Google believed it did not infringe Plaintiff's '113 patent. However, even a cursory review of the arguments raised in the letter reveal that Google's statements are just that – argument. For example, Google argues, without support, that YouTube Music is not an "Artist Specific Application" (*id.*, at p. 4). Whether this can be construed to mean ***at least one artist*** remains an open question.
> [47]

Google's arguments read like classic *Markman* arguments and would not be suitable for a motion to dismiss and therefore should not be suitable for a Motion for fees.[48] Thus, in response to Google's assertion that no pre-suit investigation was performed, EscapeX explained its infringement position, its merits-based position that Google infringed, particularly calling out Google's inappropriate claim construction at the pleading stage. There simply no evidence to overcome the presumption that the lawsuit was filed in good faith.[49] The fact that Google

---

[46] *See, e.g., Thermolife Int'l LLC v. GNC Corp.*, 922 F.3d 1347, 1356–59 (Fed. Cir. 2019).
[47] Appx0422 at 7 (7/15).
[48] *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1349 (Fed. Cir. 2018) (providing that the claim construction arguments advanced were not proper at a motion to dismiss).
[49] *Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*, 858 F.3d 1371, 1376 (Fed. Cir. 2017).

asserted its product does not have all the elements of the asserted claim of the '133 patent coupled with the fact that Google never addressed Plaintiff's contention for ***an artist specific application*** is evidence that EscapeX did conduct an adequate pre-suit investigation, did not sue the prior art and that its claims had merit.[50]

Given the lack of a full record, EscapeX further detailed its pre-suit investigation in the evidence submitted with its Motion to Amend the Judgment. Specifically, Mr. Sunatori, a technical resource, researched YouTube Music and YouTube Video, and drafted a claim chart that verified infringement of certain claims of the '113 patent by Google. Mr. Sunatori's pre-suit investigation revealed that "Auto Add" was known prior to the priority date of U.S. Patent No. 9,009,113. However, YouTube's "Auto Add" that predated the '113 patent did not include the claimed "dynamic album ... in association with an artist specific application (ASA)."[51] Thus, YouTube's "Auto Add" that predated the '113 patent did not anticipate the claims of the '113 patent but the later version did infringe.

**C. Google's Letters Were Attorney Argument**

Judge Chhabria next faults EscapeX for pressing its infringement case over Google's letters. First, Judge Chhabria does not distinguish between the letters or specify what EscapeX was to take from each letter. However, EscapeX did in fact

[50] See *Bayer CropScience AG v. Dow AgroSciences LLC,* No. 12-256, 2015 WL 1197436, at *4 (D. Del. Mar. 15, 2015), aff'd, 851 F.3d 1302 (Fed. Cir. 2017).
[51] Appx0514 at 2-3.

respond to Google's letters, specifically after the August 5th letter, EscapeX revised its infringement position and reached out to Google to discuss it,[52] filed an amended complaint[53] and served infringement contentions, inviting a merits discussion with Google.[54] It is worth noting that Google's first letter did not allege the claims were directed to patent ineligible subject matter. It was only after defendants in unrelated cases filed motions to dismiss on patent eligibility that Google jumped on the bandwagon with its second letter dated November 7, 2022.[55] However, EscapeX fought the motion in the other case but lost when on January 24, 2023, Judge Furman invalidated the '113 patent under 35 U.S.C. § 101 in the case against Block, Inc.[56] This is evidence that EscapeX was willing to test the merits of the case.

EscapeX evaluated its position and ultimately decided not to appeal. Less than three weeks later, EscapeX dismissed the case against Google. No action was taken by EscapeX in the case from January 24, 2024, until the case was dismissed, as the record shows. However, and by mistake, Ramey LLP's attorney in California filed a joint dismissal with prejudice that provided each party would

[52] Appx0203 at 1 and chart.
[53] Appx0093 and 15-1.
[54] Appx0212 at 1 and ICs.
[55] Appx0238 at 5-6.
[56] *See* Opinion and Order, Dkt. No. 30, *EscapeX IP LLC v. Block Inc.*, No. 1:22-cv-03575-JMF (S.D.N.Y. Jan. 24, 2023).

bear its own fees and costs. The only evidence before the District Court on this mater was the sworn declaration of Susan Kalra wherein she provided the document was filed by mistake:

> 4. On or about March 3, 2023 I was instructed to file a stipulation of dismissal on file as soon as possible, and that counsel for Defendant Google LLC had instructed it be filed immediately given the approaching deadline. It was my understanding that attorneys in our firm had obtained consent to file from Google's counsel.
>
> 5. At the time I filed the stipulation of dismissal, it was my intent to comply with Google's request for immediate filing. A paralegal in the firm sent me a draft of the stipulation to be filed. Because I was informed and believed Google's counsel had already consented to filing the stipulation, I filed it. In addition, because I was informed and believed Google's counsel had given consent, I included the name of one of Google's attorneys who had appeared in the case on the stipulation as having consented to the filing.
>
> 6. As soon as I was informed that I had mistakenly selected an attorney who had not given consent to file, I withdrew the stipulation. Both the filing and the withdrawal occurrec on the same day. (ECF 37 and 38). If I had known that a different attorney was the person who gave consent, I would have included his name, instead. [57]

Specifically, Ms. Kalra's declaration provides that it was a mistake that was corrected the same day it was made. Mistakes happen and when they are corrected the same day it is difficult to imagine how they support an exceptional case finding, warranting an award of fees. This is not a case where a mistake was made and left to stand. As soon as it was realized, it was corrected, the same day.

### D. EscapeX Does Not File Frivolous Suits

---

[57] Appx0437 at ¶¶4-6.

The District Court was likely misled by Google's counsel, which may have caused this erroneous ruling. In an apparent effort to sway the District Court, Google alleged that EscapeX, in another case, admitted that Apple did not infringe the '113 patent.[58] However, Google's statement is false. EscapeX only told Apple, after a discussion with Apple's counsel, that it agreed that Apple did not infringe claim 1 of the '113 patent. EscapeX specifically told Apple that it was preparing infringement charts for Claim 27 of the '113 patent.[59] EscapeX never agreed that Apple did not infringe. However, the District Court cited this part of Google's Motion as supporting the exceptional case finding,[60] Google's purposeful misstatement of the facts. Misleading statements to a court should be admonished. There is no question that Google misrepresented this 'fact' to the District Court.

It is difficult to fathom how litigation decisions in another case can be applied subjectively to support a finding of exceptionality under these facts. There is absolutely nothing in the record that supports the statement that EscapeX agreed Apple did not infringe the '113 patent. If the District Court was looking for an inference of evidence, it would have to be the single most reasonable inference of the evidence to support an exceptional case finding. However, after the e-mail

---

[58] Appx0147 at 15-16.
[59] Appx0147-16 at 1.
[60] Appx0001 at 2.

specifying that Apple infringed Claim 27,[61] while not in the record, claim charts were prepared for claim 27 in the Apple case but an agreement to dismiss was reached instead of amending the complaint. Given the pending motion to dismiss in the *Block* case, EscapeX was being cautious so as not to be accused of driving up litigation costs. In hindsight, it was the correct decision. The District Court cites no evidence from which to draw that EscapeX has a history of filing frivolous lawsuits or that it engaged in litigation misconduct, because there is none. Like in *Gust, Inc., v. Alphacap Ventures, LLC*, when counsel made a remark that the case was not worth litigating, this Court found that such statements should not be considered as supporting bad faith in an exceptional case finding.[62] Here, the issue is even cleaner as EscapeX was merely no longer asserting claim 1 but was going to assert claim 27.

### E. There is Nothing Inherently Improper About Being a Non-Practicing Entity that Settles Cases for Money

There is nothing inherently improper with being a nonpracticing entity ("NPE"), as Justice Kennedy explained:

[61] Appx0147 at 15-16; Appx0269 at 1.
[62] 905 F.3d 1321, 1333 (Fed. Cir. 2018).

> An industry has developed in which firms use patents not as a basis for producing and selling goods but, instead, primarily for obtaining licensing fees.[63]

In fact, this Court has commented on the business of a nonpracticing entity, specifying that "[w]here the patentee is an entity that uses patents primarily to obtain licensing fees, its business objectives are premised on monetary relief being sufficient to compensate for infringement."[64] NPE's are subject to the same rules as other parties and the patent statute does not restrict enforceable patent rights to those who practice the patent, even for soon to expire patents as six years of past infringement damages are potentially available.[65] This Court and the Supreme Court have recognized the role that NPE's play.[66]

In this case, the District Court appears to base its exceptional case finding on its conclusion that "[the case was] an effort to force a modest settlement by pestering a tech giant with a frivolous suit on the assumption that the tech giant will prefer to capitulate than fight back.[67] However, such a finding would not

---

[63] *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 396, 126 S. Ct. 1837, 1842, 164 L. Ed. 2d 641 (2006).
[64] *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 650 (Fed. Cir. 2015).
[65] *Thermolife Int'l LLC v. GNC Corp.*, 922 F.3d 1347, 1362 (Fed. Cir. 2019).
[66] *See id citing See Continental Paper Bag Co. v. Eastern Paper Bag Co.*, 210 U.S. 405, 424–25, 28 S.Ct. 748, 52 L.Ed. 1122 (1908); *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 703 (Fed. Cir. 2008); *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1547 (Fed. Cir. 1995); *cf. eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 393, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006).
[67] Appx0001 at 2.

show misconduct on its own.[68] While it is true that "[a] pattern of litigation *abuses* characterized by the repeated filing of patent infringement actions *for the sole purpose of forcing settlements*, with no intention of testing the merits of one's claims, is relevant to a district court's exceptional case determination under § 285."[69] This Court has emphasized "that filing a large number of suits does not, by itself, justify an inference of such an improper motive."[70]

In this case, prior to invalidation, EscapeX believed the claims of the '113 patent applied "to the activities of numerous persons, such as numerous sellers of similar products, and [EscapeX believed it had] a legitimate interest in pressing reasonably grounded claims against all [] of them."[71]

As this Court has stated, "there is no minimum damages requirement to file a patent infringement case," and "[a]sserting seemingly low damages against multiple defendants—or settling with defendants for less than the cost of

---

[68] *Thermolife Int'l LLC*, 922 F.3d at 1362
[69] *SFA Sys., LLC v. Newegg Inc.*, 793 F.3d 1344, 1350 (Fed. Cir. 2015); *see Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1324–28 (Fed. Cir. 2011).
[70] *SFA Sys.*, 793 F.3d at 1351.
[71] *Thermolife Int'l LLC*, 922 F.3d at 1363 *citing Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*, 858 F.3d 1371, 1375 (Fed. Cir. 2017) (distinguishing legitimate "motivation to implement the statutory patent right by bringing suit based on a reasonable belief in infringement" from motivation "to harass or burden an opponent"); *and King Instruments Corp. v. Perego*, 65 F.3d 941, 950 (Fed. Cir. 1995) (recognizing deterrence value of enforcement actions).

litigation—does not necessarily make a case 'exceptional' under § 285."[72] This Court recognized that a patent plaintiff is able to make patent litigation more affordable by distributing common costs over many suits, thus making each suit worthwhile on lower terms.[73] Moreover, as for settlement amounts, a low figure might simply reflect the small size of an individual defendant's potential liability. Indeed, the figure may result from what the Supreme Court has recognized as the normal, legitimate settlement calculus, which includes consideration of litigation costs: specified as a prediction of the amount of liability, discounted by its probability, plus the transaction costs of further litigation.[74] However, in today's patent infringement world, another factor that should be considered by the courts are the high costs of patent infringement litigation, which are high enough to take away most patent plaintiff's access to legal representation. Liability and damages experts alone can be several hundred thousand dollars with the costs of even small cases getting into the 7 figures. As such, patent litigation has become so expensive as to make it almost impossible for most patent owners to enforce their patents, in large part due to the litigation tactics of parties like Google who commonly make the costs higher than necessary. A court should consider these factors in making a

---

[72] *Thermolife Int'l LLC*, 922 F.3d at 1363-4 *citing AdjustaCam, LLC v. Newegg, Inc.*, 861 F.3d 1353, 1361 (Fed. Cir. 2017).
[73] *See Id.*
[74] *Evans v. Jeff D.*, 475 U.S. 717, 734, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986); *see Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1369 (Fed. Cir. 2017).

finding of frivolousness to force a modest settlement. Also, there is no evidence, or anything in the record, that EscapeX sought nuisance value settlements while pressing baseless infringement contentions.

In the present case, the evidence shows that EscapeX pressed its claims through a motion to dismiss in a related case. There was no motion to dismiss in this case. In short, EscapeX tested the merits of its case.

### F. Under the Case Law from this Court, the Case is not Exceptional

It is true that the Supreme Court instructs that an "exceptional" case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated.[75] The Supreme Court explained that "[d]istrict courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances.[76] " 'There is no precise rule or formula for making these determinations,' but instead ***equitable discretion*** should be exercised 'in light of the considerations we have identified.' "[77] Thus, a district court is instructed to

---

[75] *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554, 134 S. Ct. 1749, 1756, 188 L. Ed. 2d 816 (2014).
[76] *Id.*
[77] *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554, 134 S. Ct. 1749, 1756, 188 L. Ed. 2d 816 (2014) *quoting Fogerty v. Fantasy, Inc.,* 510 U.S. 517, 534, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994) (emphasis added).

consider the substantive strength of a parties litigating position (through the governing law and the facts of the case) and whether the case was litigated unreasonably, and apply its equitable discretion. Here, in the underlying case, the party's litigation position was not developed and there are no facts to support that the case was litigated unreasonably, considering that EscapeX did not file an opposition to the motion to transfer and dismissed its case when another court found the Patent-in-Suit, the '113 patent, invalid. Moreover, the District Court that awarded the fees was only assigned the case after the briefing on the Motion for Fees under Section 285 was complete.[78] While this Court reviews for abuse of discretion, in part because of a district court's familiarity with the case, when that familiarity is not present, such as in this case, the deference to the District Court should be less.[79]

This Court has been clear that "fee awards are not to be used 'as a penalty for failure to win a patent infringement suit.'"[80] As this Court explained, "[t]he legislative purpose behind § 285 is to prevent a party from suffering a 'gross injustice': 'The exercise of discretion in favor of [awarding attorney fees] should

---

[78] Judge Chhabria was assigned the case on June 16, 2023, after the briefing on the motion for fee was complete.
[79] *Thermolife Int'l LLC v. GNC Corp.*, 922 F.3d 1347, 1356–59 (Fed. Cir. 2019).
[80] *Checkpoint Sys., Inc.*, 858 F.3d at 1376 *citing Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 548-9, 134 S. Ct. 1749, 1753, 188 L. Ed. 2d 816 (2014).

be bottomed upon a finding of unfairness or bad faith in the conduct of the losing party, or some other equitable consideration of similar force, which makes it grossly unjust that the winner of the particular law suit be left to bear the burden of his own counsel fees.'"[81]

As this Court said in *Thermolife Int'l LLC v. GNC Corp.*:

> As a practical matter, moreover, one stated rationale for deference—the district court's distinctive familiarity with the issues relevant to fees due to its extensive work on the merits of the case—is weaker when the award of fees rests on a basis not meaningfully considered before fees were sought after the merits were resolved. Also, a fuller explanation of the court's assessment of a litigant's position may well be needed when a district court focuses on a freshly considered issue than one that has already been fully litigated….
> To be sure, due process and other procedural rights must be respected in deciding the exceptional-case question as a precondition to awarding fees against a losing party. [citation omitted] And more process may well be needed on a fees motion when the issue presented as a basis for fees has not previously been litigated.[82]

The award of fees in this case lacked the necessary process.

In this case, prior to filing its Motion for Attorneys' Fees, Google's significant *on-record* actions were limited to the submission of two substantially similar Answers and a Motion to Transfer. Google did correspond in letters dated

---

[81] *Checkpoint Sys., Inc.*, 858 F.3d at 1376; S. Rep. No. 1503, 79th Cong., 2d Sess. (1946) (addressing the § 70 precursor to § 285)
[82] *Thermolife Int'l LLC v. GNC Corp.*, 922 F.3d 1347, 1357 (Fed. Cir. 2019).

August 5, 2022, and November 7, 2022 with counsel for EscapeX,[83] to which EscapeX responded.[84] Notably, these letters were not made part of the official record until after the case's dismissal.[85] This rendered EscapeX unable to address these critical allegations of invalidity and non-infringement on the record, and as such, the District Court did not have the opportunity to adjudicate these matters. However, EscapeX did respond to Google and explained why it believed its claims were still meritorious.[86] In equity, as a basis for the fee awards, at least in this case, Google should have presented its noninfringement position and invalidity position on the record while the case was open rather than for the first time as an exhibit to a fee motion. The merits of Google's position need to be tested. For reasons similar to *Gust, Inc., v. Alphacap Ventures, LLC*, [87] this case is not exceptional. At the very least, under the facts of this case, due process requires the merits of EscapeX's infringement and validity position is further developed before an award of fees.

## II. THE COURT ERRED IN DENYING THE MOTION TO AMEND

[83] Appx0194 and Appx0238, respectively.
[84] Appx0203 and Appx0212.
[85] Appx0194 and Appx0238.
[86] Appx0203.
[87] 905 F.3d 1321, 1330–34 (Fed. Cir. 2018)

Courts in the Ninth Circuit may amend a judgment if "the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law. There may also be other, highly unusual, circumstances warranting reconsideration.[88]

At the January 25, 2024 hearing on the motion for sanction under §1927, EscapeX explained that Ramey LLP's client requested that the motion be filed[89] and the reasons for asserting that there were highly unusual circumstances that resulted in the manifest injustice of the granting of the Motion for Fees under §285. The evidence with the motion for a new trail were two declarations drafted in a way that the evidence was not evidence that had been considered before by the District Court, to more fully develop the record. The new evidence consisted of a declaration of a technical expert who helped in preparing the claim charts[90] and the manager of DynaIP Deal, Carlos Gorrichategui, Ph.D.[91] The highly unusual circumstances that EscapeX believed warranted a motion to amend the judgment were further shared with the Court at the January 25, 2024 hearing,[92] and through

---

[88] *Sch. Dist. No. 1J, Multnomah Cnty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993).
[89] Appx0685 at 6.
[90] Appx0514.
[91] Appx0512.
[92] Appx0685 at 5.

the declaration of William P. Ramey, III, and included:

(1) the way in which the case arrived before this Court;

(2) the lack of a fully developed record on the pre-suit investigation as Google only attacked the pleadings in its motion for fees;

(3) the lack by Google of any prior motion to dismiss where the merits of EscapeX's positions could be discussed; and,

(4) the length of time the case was pending before the Court.[93]

EscapeX did present that it had performed a diligent pre-suit investigation[94] and explained its infringement positions.[95] However, the District Court credited none of that evidence to support EscapeX's opposition to Google's First Motion for Fees. Due to the two months the case was pending with Judge Chhabria, EscapeX believed a more complete record would serve its due process needs and provide for substantial justice.[96] An award of fees is grounded in equity and should require that sanctions motions are decided on a record more complete than the one in which the District Court decided Google's First Motion for Fees, at least in cases where the District Court discounts certain evidence. Based on the unusual circumstance of that not happening, EscapeX requested its attorney file the Motion

[93] Appx0611 at ¶4.
[94] Appx0615, *generally* and Appx0512, *generally*.
[95] Appx0422 at 8.
[96] *Thermolife Int'l LLC v. GNC Corp.*, 922 F.3d 1347, 1357 (Fed. Cir. 2019).

to modify the judgment and submitted the two new declarations directed to evidence not previously considered by the District Court ("Rule 59(e) Motion").[97]

Motions for sanctions are not supposed to be 'gotcha games' where an undeveloped record can be manipulated, as Google did with this one. There can be no dispute that the record before the District Court was not well developed. Further, it cannot be disputed that EscapeX did present its infringement theory which included its validity theory, that Google's Accused Instrumentality did not have the '113 patent's distinguishing feature: i.e., "played by an artist specific application associated with an artist" prior to the filing date of the '113 patent.[98] Further, it cannot be disputed that the District Court credited none of this evidence for EscapeX. However, merits decisions on a partial record cannot be said to further any substantial purpose and possibly result in incorrect decisions, as EscapeX believes happened in the case. While a court has discretion in the grant or denial of a rule 59(e) motion, that discretion should be questioned when a denial results in sanctions to a party and its lawyers because of a partial record. Let the full record in and then determine the propriety of any sanction. A motion for sanctions should not be a "gotcha game" as this one became.

## III. THE SANCTIONS UNDER 28 U.S.C. §1927 SHOULD BE REVERSED

[97] Appx0611 at ¶3.
[98] Appx0422 at 8.

### A. The Ninth Circuit Requires a Finding of Subjective Bad Faith

Section 1927 provides that a court may require an attorney to "satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred" when the attorney "multiplies the proceedings in any case unreasonably and vexatiously."[99] However, a lawyer should not be sanctioned for failing to abandon his client's case at the drop of a motion, unless there is no colorable defense to the motion that can be advocated and no possible merit to any argument that can be advanced.[100] The Supreme Court has cautioned that court's must find fraud or abuse of the judicial process sufficiently beyond 'exceptional' before it can invoke its inherent sanctioning power.[101] The Ninth Circuit requires evidence of bad faith, improper motive, or reckless disregard of the duty owed to the court.[102] "Sanctions pursuant to section 1927 must be supported by a finding of subjective bad faith."[103] "Bad faith is present when an attorney knowingly or recklessly raises a frivolous argument or argues a meritorious claim for the purpose of harassing an opponent."[104] "In the Ninth Circuit, Courts wishing to impose sanctions under §

---

[99] 28 U.S.C. § 1927.
[100] *Stitt v. Williams,* 919 F.2d 516, 528 (9th Cir.1990).
[101] *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44, 111 S. Ct. 2123, 115 L.Ed.2d 27 (1991).
[102] *See In re Keegan Management Co.,* 78 F.3d 431, 436 (9th Cir.1996).
[103] *New Alaska Dev. Corp. v. Guetschow,* 869 F.2d 1298, 1306 (9th Cir.1989).
[104] *Trulis v. Barton*, 107 F.3d 685, 694 (9th Cir. 1995).

1927 must make a finding that the attorney to be sanctioned acted with subjective bad faith."[105] Further, Section 1927 only authorizes shifting fees that are associated with the persistent prosecution of a meritless claim.[106]

The Ninth Circuit is clear that an award of sanctions under a court's inherent authority must be preceded by a finding of bad faith, or conduct that constituted or was tantamount to bad faith.[107]

**B. The District Court's Sanction Order**

The District Court's Order granting sanctions under 28 U.S.C. §1927 against William P. Ramey, III and Susan Kalra ("EscapeX's Counsel") jointly and severally in the amount of $63,525.30 is premised upon the finding that "the attorneys for EscapeX acted recklessly by filing a frivolous Rule 59(e) motion that unreasonably multiplied the proceedings of this case."[108] Judge Chhabria explained that the two declarations submitted with EscapeX's motion to modify the judgment contained information that was already known to EascapeX at the time of the original fee motion.[109] Judge Chhabria further provided that EscapeX failed to explain why the declarations should be considered new evidence and therefore

[105] *Caputo v. Tungsten Heavy Powder, Inc.*, 96 F.4th 1111, 1153 (9th Cir. 2024).
[106] *Browning v. Kramer,* 931 F.2d 340, 345 (5th Cir.1991).
[107] *Gomez v. Vernon*, 255 F.3d 1118, 1134 (9th Cir. 2001).
[108] Appx00727 at 1.
[109] Appx00727 at 1.

EscapeX's Rule 59(e) motion was frivolous.[110] Judge Chhabria further found EscapeX"s counsel reckless by not withdrawing the motion when requested by Google.[111] Judge Chhabria references bad faith or recklessness with regard to EscapeX's argument that the original fee order was manifestly unjust, as the court did not see that position in EscapeX's original motion.[112]

### C. The Record in This Case Was Lacking

While it is true that "a finding that the attorneys recklessly raised a *frivolous* argument which resulted in the multiplication of the proceedings" may justify a § 1927 sanction."[113] "[F]rivolous arguments for the purposes of § 1927 sanctions [are] ones that are baseless and made without reasonable and competent inquiry or made up of legal or factual contentions so weak as to constitute objective evidence of improper purpose."[114] Here, the only evidence before the District Court was that abundant care was taken to consider the nature of the evidence being submitted with the Rule 59(e) Motion. Specifically, EscapeX explained to the District Court that:

> EscapeX did not ask the court for reconsideration of its prior ruling based on the submission of a new declaration. Rather, EscapeX, after

[110] Appx00727 at 1-2.
[111] Appx00727 at 2.
[112] Appx00727 at 2.
[113] *Caputo v. Tungsten Heavy Powder, Inc.*, 96 F.4th 1111, 1154–55 (9th Cir. 2024).
[114] *Caputo v. Tungsten Heavy Powder, Inc.*, 96 F.4th 1111, 1155 (9th Cir. 2024).

> consultation with its client and consideration of the Court's Order awarding fees, strongly believed that Google's actions by not presenting the full record to the Court likely resulted in manifest injustice. In short, EscapeX and its counsel believed this was one of those rare, unusual cases where submission of the full record would be appropriate.[115] EscapeX and its counsel attempted, in good faith, to make new arguments on the new evidence, and was not arguing for reconsideration of the previous facts before the court. There simply is no evidence of bad faith, objective or subjective.[116]

The facts of this case are highly unusual in that no substantive decision on EscapeX's infringement position occurred prior to Google's Motion for Fees under 35 U.S.C. §285 ("Google's First Motion for Fees"). There simply was no record in this case other than what was briefed to the District Court in Google's First Motion for Fees. EscapeX defended its infringement position in response to Google's First Motion for Fees by providing that:

> Google's arguments (Google's Motion at pp. 5-7; Ex. 7 to Banner Decl. (ECF 41-8)) with respect to the "auto add" feature and the claims of non-infringement are, at best, a matter of claim interpretation. For instance, the videos referenced on page 6 of Google's Motion do not disclose the '113 patent's distinguishing feature: i.e., "played by an artist specific application associated with an artist". [117]

Thus, YouTube's "Auto Add" that predated the '113 patent did not anticipate the claims of the '113 patent, as admitted by Google, as it was not until a later version incorporated the *artist specific application*. How could the District Court find that

---

[115] *See, e.g., Sch. Dist. No. 1J, Multnomah Cnty., Or.*, 5 F.3d at 1263.
[116] Appx0596 at 5-6.
[117] Appx0422 at 8.

EscapeX sued the prior art when Google alleges that its product does not perform all the elements? Moreover, the District Court made validity and infringement decisions based solely on the record presented in a motion for fees. Such decisions smack of a lack of due process, at least in this case. At the very least EscapeX's Rule 59(e) Motion was proper as it presented arguments that were not considered by the District Court on the merits.

While it is true that EscapeX could have presented the two declarations that supported its Rule 59(e) Motion in response to Google's First Motion for Fees, that does not render the Rule 59(e) Motion frivolous.[118] Under Ninth Circuit precedent, the Rule 59(e) Motion and the two declarations would have to be "baseless and made without reasonable and competent inquiry or made up of legal or factual contentions so weak as to constitute objective evidence of improper purpose."[119] Here, it cannot be disputed that the evidences was not previously considered by the District Court or that William P. Ramey, III made a competent inquiry into the propriety of filing the Rule 59(e) Motion, that included:

> 3. After receiving the Court's Order awarding fees in Doc. No. 57, my client EscapeX, though Carlos Gorrichategui, Ph.D approached me about what steps could be taken. He and I discussed the finality of the Court's Order and what it meant. We specifically discussed the unusual events that led to the fee award and whether a motion to

---

[118] *See, e.g., Caputo v. Tungsten Heavy Powder, Inc.*, 96 F.4th 1111, 1155 (9th Cir. 2024).

[119] *Caputo v. Tungsten Heavy Powder, Inc.*, 96 F.4th 1111, 1155 (9th Cir. 2024).

> amend the judgment would be proper. Neither Dr. Gorrichategui or I intended to file any evidence previously considered by the Court nor advance arguments the Court had already considered based on already considered evidence. However, we both felt that under the unusual circumstances of the case, providing the full pre-suit investigation would correct what we believed was manifest injustice.
> 4. We both felt the unusual circumstances included (1) the way in which the case arrived before this Court; (2) the lack of a fully developed record on the pre-suit investigation as Google only attacked the pleadings in its motion for fees; (3) the lack by Google of any prior motion to dismiss where the merits of EscapeX's positions could be discussed; and, (4) the length of time the case was pending before the Court.[120]

Thus, EscapeX believes there was adequate factual basis to make the arguments and that sufficient inquiry was made into legal basis. EscapeX freely admits that the situation might be different had the District Court previously considered the evidence submitted in support of the Rule 59(e) Motion. For example, in *Caputo v. Tungsten Heavy Powder, Inc.*, the Ninth Circuit upheld a sanction under §1927 against counsel that advanced arguments previously considered multiple times, but declined to find the conduct of a different attorney in the same matter was sanctionable under §1927 because that attorney did not act with the requisite bad faith.[121] Here, EscapeX's Rule 59(e) Motion served the interests of justice so that a more complete record was available to the District Court and while the District Court denied the Rule 59(e) Motion, that does not make EscapeX's Counsel liable

---

[120] Appx0611 at 2, ¶¶3-4.
[121] *Caputo v. Tungsten Heavy Powder, Inc.*, 96 F.4th 1111, 1156–57 (9th Cir. 2024).

under §1927. Bad faith should only be inferred from attorney action if the actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay.[122] Here, the record does not support bad faith but rather the interests of justice. Contrary to Judge Chhabria's contention, EscapeX did mention manifest injustice in its original motion,[123]and discussed how the lack of a record likely resulted in an incorrect decision.[124] There is no basis for finding William P. Ramey, III and Susan Kalra liable under §1927 and this Court is requested to reverse the District Court's Order and render judgment denying sanctions under §1927 or the District Court's inherent power.[125]

## IV. GOOGLE'S EXPECTED RESPONSE

EscapeX anticipates that Google will attack Ramey LLP and its attorneys and mention to this Court that the District Court told Ms. Kalra at the hearing on Google's First Motion for Fees that he did not want to see another declaration.[126] However, Google's argument is just hand-waving as Ramey LLP is allowed to use the Rules of Civil Procedure to represent its client EscapeX and its other clients. Likewise, Google is likely to cite to Ms. Kalra's testimony at the hearing on

---

[122] *Gust, Inc., v. Alphacap Ventures, LLC*, 905 F.3d 1321, 1331 (Fed. Cir. 2018).
[123] Appx0502 at 2.
[124] Appx0502 at 4-6.
[125] Appx00727.
[126] Appx0478.

Google's Firm Motion for Fees that she was not aware of the pre-suit investigation as she was not at the Firm at the time. However, the pleadings addressed this issue as Google's infringement defense established that it did not believe it practiced all of the elements of the claims of the '113 patent.[127] Further, Ms. Kalra's pleadings to the District Court that Google's product did not possess ***an artist specific application***[128] until after the '113 patent is evidence of EscapeX's infringement position and pre-suit diligence.[129] Undoubtedly, Google will try and bring up other cases and allege bad acts from those other cases. However, Google will provide no true nexus between the cases and rather will simply attempt to smear counsel. While Google will likely allege that Ramey LLP has sued it multiple times, each of those lawsuits is separate and should be separately considered.

Ramey LLP has a mission of making patent litigation available to all patent owners with valid infringement claims. Ramey LLP is able to level the playing field by efficiently litigating patent infringement cases . Ramey LLP tries to make patent infringement litigation affordable for those patent infringement cases where the potential damages make the case unattractive to most firms. Ramey LLP believes all meritorious claims can be pursued and all intellectual property owners

[127] Appx0615 at 2-3.
[128] Appx0192 at 4 (5/10).
[129] Appx0615 at 2-3.

deserve representation. That Google finds itself accused of infringing patents is not a commentary on Ramey LLP but rather the business practices of Google.

## CONCLUSION AND RELIEF SOUGHT

EscapeX IP, LLC seeks a reversal and rendering that the case is not exceptional and an Order relieving it from the District Court's Order awarding attorneys' fees under §285. Further, EscapeX requests the District Court's Order granting fees under §1927 is reversed as EscsapeX's counsel was representing their client.

Date: May 6, 2024

Respectfully submitted,

**Ramey LLP**

*/s/ William P. Ramey, III*
William P. Ramey, III
Texas State Bar No. 24027643
5020 Montrose Blvd., Suite 800
Houston, Texas 77006
713-426-3923 (Telephone)

***ATTORNEYS FOR ESCAPEX IP, LLC***

## CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on May 6, 2024, by electronic means (by email or CM/ECF).

By: */s/ William P. Ramey, III*
William P. Ramey, III

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)(B)

The undersigned counsel of records for Plaintiff-Appellant, EscapeX IP, LLC, certifies that this Principal Brief of Plaintiff-Appellants complies with the typeface requirement provided in Rule 32(a)(5) and type-volume limitation provided in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. In preparing this certificate, I relied on word-count program of Microsoft Word 2023. This Brief contains 8,996 words.

Dated: May 6, 2024 By: /s/ William P. Ramey, III
William P. Ramey, III

# ADDENDUM

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESCAPEX IP LLC,<br>Plaintiff,<br>v.<br>GOOGLE LLC,<br>Defendant. | Case No. 22-cv-08711-VC<br><br>**ORDER GRANTING MOTION FOR ATTORNEYS' FEES UNDER 35 U.S.C. § 285**<br><br>Re: Dkt. No. 41 |

The motion for attorneys' fees is granted. This order assumes the reader's familiarity with the facts of the case, the relevant law, and the arguments made by the parties.

Google is the prevailing party because the parties stipulated to the dismissal of EscapeX's claims with prejudice. *United Cannabis Corporation v. Pure Hemp Collective, Inc.*, 66 F.4th 1362, 1367–68 (Fed. Cir. 2023). And Google has met its burden to show that this is an exceptional case under the meaning of the fee-shifting statute.

It is obvious that EscapeX conducted no serious pre-suit investigation and that this case was frivolous from the start. EscapeX's initial and first amended complaints cobbled together features from two different YouTube products to allege infringement of its purported patent. *See* Dkt. Nos. 1, 8. When alerted to this fact by Google—a fact that a basic pre-suit investigation would have uncovered—EscapeX amended its complaint to assert its infringement claim only against the YouTube Video product. *See* Dkt. No. 15. But EscapeX's infringement contentions asserted a priority date of October 21, 2014. Dkt. No. 41-7. A basic online search would have revealed that the accused "Auto Add" feature predated EscapeX's patent. *See* Dkt. No. 41-8 at 2.

Google placed EscapeX on notice of the baselessness of its claim early and often, urging

it to dismiss the case. *See* Dkt. Nos. 41-5; 41-8; 41-9; 41-10; 41-11; 41-12. But EscapeX pressed on. In fact, even after Judge Furman declared the ’113 patent invalid in January 2023, EscapeX waited another month and a half before dismissing this case. *See EscapeX IP LLC v. Block, Inc.*, No. 22-cv-3575-JMF, 2023 WL 373180, at *4–*8 (S.D.N.Y. Jan. 24, 2023). Worse still, when it finally did so, it was by way of a “stipulated” dismissal, with each party to bear its own fees and costs, that Google had not agreed to. Dkt. No. 37; *see also* Dkt. Nos. 41-1 at 8–9; 41-15. Although this case would be exceptional under section 285 in any event, ExcapeX certainly poured dirt on itself by engaging in this litigation misconduct. The attorneys for EscapeX are lucky that Google did not separately ask the Court to impose sanctions on them. *See Segan LLC v. Zynga Inc.*, 131 F. Supp. 3d 956, 964 (N.D. Cal. 2015) (“[lawyers] could be held jointly and severally liable under Rule 11 for an entire section 285 fee award if they file such an objectively baseless patent infringement suit in the future.”).

This was, in short, an effort to force a modest settlement by pestering a tech giant with a frivolous suit on the assumption that the tech giant will prefer to capitulate than fight back. Indeed, EscapeX and its parent company DynaIP have a history of bringing frivolous suits for this purpose. *See* Dkt. No. 41 at 15–16 (collecting cases); *see also* Dkt. No. 41 at 9 n.2 & 24 n.8. EscapeX is ordered to reimburse Google in the amount of $191,302.18. *See* Dkt. Nos. 41-1, 41-28 (requesting and justifying $140,615.73 in fees and costs incurred prior to the filing of this motion); Dkt. Nos. 55-1, 55-2 (requesting and justifying an additional $50,686.45 in fees and costs associated with this motion). The Court is satisfied that the declarations Google has submitted adequately justify this amount (which, in any event, is facially reasonable), and so EscapeX’s objections based on Local Rule 54 are overruled. *See* Dkt. No. 56.

**IT IS SO ORDERED.**

Dated: August 16, 2023

VINCE CHHABRIA
United States District Judge

**Tina Hueske**

| | |
|---|---|
| **From:** | ECF-CAND@cand.uscourts.gov |
| **Sent:** | Monday, October 30, 2023 1:48 PM |
| **To:** | efiling@cand.uscourts.gov |
| **Subject:** | Activity in Case 3:22-cv-08711-VC Escapex IP LLC v. Google LLC Order on Motion to Alter Judgment |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
*****NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court**

**California Northern District**

## Notice of Electronic Filing

The following transaction was entered on 10/30/2023 at 11:48 AM and filed on 10/30/2023

**Case Name:** Escapex IP LLC v. Google LLC
**Case Number:** 3:22-cv-08711-VC
**Filer:**
**WARNING: CASE CLOSED on 03/07/2023**
**Document Number:** 65(No document attached)

**Docket Text:**
**ORDER. EscapeX's [59] Motion to Alter Judgment is denied because EscapeX has wholly failed to meet the Rule 59(e) standard for amending a judgment. Signed by Judge Vince Chhabria. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (vclc2, COURT STAFF) (Filed on 10/30/2023)**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ESCAPEX IP LLC,
Plaintiff,
v.
GOOGLE LLC,
Defendant.

Case No. 22-cv-08711-VC

**ORDER GRANTING MOTION FOR ATTORNEYS' FEES UNDER 28 U.S.C. § 1927**

Re: Dkt. No. 66

The motion for attorneys' fees is granted. This order assumes the reader's familiarity with the facts of the case, the relevant law, and the arguments made by the parties.

When an attorney unreasonably or vexatiously multiplies the proceedings, courts may require the attorney to personally satisfy "the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28. U.S.C. § 1927. To impose sanctions under § 1927, a court must find that the attorney's conduct was at least reckless. *See Fink v. Gomez*, 239 F.3d 989, 993 (9th Cir. 2001). Here, the attorneys for EscapeX acted recklessly by filing a frivolous Rule 59(e) motion that unreasonably multiplied the proceedings of this case.

EscapeX's Rule 59(e) motion—seeking reversal of this Court's previous fee order—argued that reversal was warranted based on newly discovered evidence. *See* Dkt. No. 59. But the evidence EscapeX presented in no way met the standard of newly discovered evidence under Rule 59(e). EscapeX submitted two declarations—one from EscapeX's president and one from an engineer who drafted EscapeX's claim charts—both of which contained information that was already known by EscapeX at the time of Google's original fee motion. Just because EscapeX failed to include these declarations at that time does not mean that they constituted "newly

discovered evidence." *See School District No. 1J, Multnomah County, Oregon v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993). EscapeX also provided no argument explaining why these declarations should have been considered "newly discovered evidence." Other than reciting the legal standard for a Rule 59(e) motion, EscapeX's motion cited no authority for its position that the declarations constituted new evidence. Instead, the motion simply summarized what was in the declarations and raised arguments that could have been made prior to entry of the initial fee award. *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 486 n.5 (2008) ("Rule 59(e) . . . may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment."). As a result, EscapeX's Rule 59(e) motion was frivolous. And EscapeX's attorneys' refusal to withdraw or amend their motion when informed by Google's counsel of its numerous problems, at a minimum, constitutes recklessness.

Moreover, in its opposition to Google's current attorneys' fees motion, EscapeX argues that it filed its Rule 59(e) motion based on its belief that the original fee order was manifestly unjust. *See* Dkt. No. 73. However, this argument is found nowhere in EscapeX's actual motion. If the basis for the motion was indeed a belief that there was manifest injustice, then that is even more reason to find that EscapeX's attorneys acted recklessly or in bad faith by filing a motion to reconsider on the grounds of newly discovered evidence.

In light of this conduct, Google requests reimbursement for its attorneys' fees and costs in the amount of $92,602.95. *See* Dkt. No. 66 (requesting $34,447.65 in fees and costs incurred in responding to the Rule 59(e) motion and in preparing this fees motion); Dkt. No. 83 (requesting an additional $58,155.30 in fees and costs incurred in filing this fees motion, preparing/filing a reply, and arguing at the hearing). While Google's request for $34,447.65 in connection with responding to the Rule 59(e) motion and preparing this fees motion is facially reasonable, its request for $58,155.30 for its subsequent work is not. It is unreasonable for the cost of filing—as opposed to preparing—a fees motion, preparing and filing a reply brief, and arguing at a 13-minute hearing to be more than 1.5 times greater than responding to a Rule 59(e) motion and preparing a fees motion. Therefore, Google is entitled to reimbursement of its

reasonable attorneys' fees and costs in the amount of $63,525.30 to be levied jointly and severally against EscapeX's attorneys, William P. Ramey, III and Susan S.Q. Kalra.[1]

**IT IS SO ORDERED.**

Dated: February 12, 2024

VINCE CHHABRIA
United States District Judge

[1] Google also requests that the previously awarded fees and costs be levied jointly and severally against these attorneys. However, they did not make this request at the time they sought their original attorneys' fees award, making this current request untimely.

US009009113B1

(12) **United States Patent**
**Shapira**

(10) **Patent No.: US 9,009,113 B1**
(45) **Date of Patent: Apr. 14, 2015**

(54) **SYSTEM AND METHOD FOR GENERATING ARTIST-SPECIFIED DYNAMIC ALBUMS**

(71) Applicant: **Escapemusic Limited**, Kowloon (HK)

(72) Inventor: **Sephi Joseph Shapira**, Ramot Hasavim (IL)

(73) Assignee: **Escapemusic Limited**, Kowloon (HK)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **14/519,168**

(22) Filed: **Oct. 21, 2014**

(51) **Int. Cl.**
***G06F 17/30*** (2006.01)

(52) **U.S. Cl.**
CPC ................................ ***G06F 17/30749*** (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 8,515,979 | B2 | 8/2013 | Mehta | 707/758 |
| 8,560,950 | B2 | 10/2013 | Bull et al. | 715/716 |
| 8,694,813 | B2 | 4/2014 | Shayer | 713/323 |
| 2007/0174866 | A1 | 7/2007 | Brown et al. | 725/28 |
| 2009/0204490 | A1 | 8/2009 | Squillace et al. | 705/14 |
| 2009/0210808 | A1 | 8/2009 | West | 715/764 |
| 2010/0299212 | A1 | 11/2010 | Graylin et al. | 705/14.66 |
| 2011/0196726 | A1 | 8/2011 | Poellnitz | 705/14.16 |
| 2012/0042263 | A1 | 2/2012 | Rapaport et al. | 715/753 |
| 2012/0254250 | A1 | 10/2012 | Gentile et al. | 707/793 |
| 2013/0030987 | A1 | 1/2013 | Zuckerberg et al. | 705/39 |
| 2013/0031478 | A1 | 1/2013 | Strober | 715/716 |
| 2013/0160145 | A1 | 6/2013 | Henzie et al. | 726/29 |
| 2013/0254113 | A1 | 9/2013 | Singh et al. | 705/59 |
| 2013/0325621 | A1 | 12/2013 | Sanginiti et al. | 705/14.64 |
| 2014/0031086 | A1 | 1/2014 | Yoo | 455/566 |
| 2014/0059059 | A1 | 2/2014 | Barman et al. | 707/752 |
| 2014/0075394 | A1 | 3/2014 | Nawle et al. | 715/863 |
| 2014/0137204 | A1 | 5/2014 | Vitzthum et al. | 726/4 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO 02/45316 | 6/2002 |

*Primary Examiner* — Bai D. Vu
(74) *Attorney, Agent, or Firm* — Pillsbury Winthrop Shaw Pittman LLP

(57) **ABSTRACT**

A system and method is provided that facilitate artist-specified dynamic albums that include music that may be changed with or without intervention by a user at a user device at which a dynamic album has been stored, according to an implementation of the invention. A dynamic album may include a set of songs provided through an artist specific application installed at a user device. The system may modify the dynamic album based on one or more album parameters that specify a change to be made to the set of songs. For example, the one or more album parameters specify the removal of one or more songs from the dynamic album, the addition of one or more new songs, the replacement of one or more songs, a rearrangement of (e.g., shuffling) the order of one or more songs, and/or other change to the set of songs.

**30 Claims, 22 Drawing Sheets**




100
APPLICATION MARKETPLACE(S) 140
SOCIAL MEDIA PROVIDER(S) 150
ADVERTISING PROVIDER(S) 160
102
COMPUTER SYSTEM 110
PROCESSOR(S) 112
STORAGE DEVICE(S) 114
PLATFORM MANAGEMENT APPLICATION 120
SYSTEM INSTRUCTIONS 122
130
USER DEVICE 170
PROCESSOR(S) 172
STORAGE DEVICE(S) 174
ARTIST SPECIFIC APPLICATION 124
SYSTEM INSTRUCTIONS 122

FIG. 1


200
202
Receive communication from artist specific application
204
Renew music lease?
206
Provide renewal to artist specific application
208
Provide indication of non-renewal
210
Obtain updated content related to artist specific applicatoin
212
Provide updated content

FIG. 2


300
302
Launch / initialize artist specific application and attempt communication with computer system
304
Communication established?
306
Music lease renewed?
No
310
Music lease expired?
Yes
Yes
308
Update expiration of music lease
No
312
Play music
314
No
Updates from computer system?
Yes
316
Apply updates for display to user
318
Locally obtained updates?
No
Display existing content with any updated content
322
Yes
320
Apply updates for display to user

FIG. 3


400
SYSTEM INSTRUCTIONS 122
COMMAND MANAGER 402
SOCIAL MEDIA MANAGER 410
DISCUSSION BOARD MANAGER 418
UPDATE MANAGER 404
ADVERTISEMENT MANAGER 412
ACCOUNTING MANAGER 420
USAGE ANALYTICS ENGINE 406
ARTIST ENDORSEMENT MANAGER 414
CROSS-APPLICATION MANAGER 422
LOYALTY PROGRAM MANAGER 408
FAN BOARD MANAGER 416
PLAYLIST MANAGER 424
DYNAMIC ALBUM MANAGER 426

FIG. 4


500
502
Obtain first content related to first artist specific application
504
Obtain second content related to second artist specific application
506
Store first content and second content
508
Receive a request for information from an artist specific application
510
Search the first content and the second content
512
Provide results

FIG. 5


600
602
Obtain search terms
604
Search artist specific application content
606
Obtain results
608
Search other artist specific applications on device?
No
Yes
610
Identify other artist specific applications on device
612
Search and obtain results for artist specific applications
614
Search remote devices?
No
Yes
620
Display results
616
Query remote device
618
Obtain results

FIG. 6


700
701
Song 1, App 1
702
Song 2, App 2
703
Song 3, App 2
704
Song 4, App 3
705
Song 5, App 1
70n
Song n, App N
$t_1$
$t_2$
$t_3$
$t_4$
$t_5$
$t_n$

FIG. 7


800
Obtain Playlist
802
Generate Playlist Instructions
804
Open/Activate Current Application
806
Close/Deactivate Previous Applications (if any)
808
Cause the Current Song to be Played
810
Current Application=Next Application in the Playlist
812
No
Yes

FIG. 8


900
Receive Instructions
902
Identify Song to be Played Based on Instructions
904
Cause the Song to Play
906
Send an Indication that the Song has been Played
908

FIG. 9


1000
Receive Instructions
1002
Identify Song to be Played Based on Instructions
1004
Cause the Song to Play
1006
Identify the Next Song to be Played
1008
Is the Next Song within the Current Application?
1010
Yes
No
Identify the Next Application Associated with the Next Song
1012
Pass Instructions to the Next Application
1014

FIG. 10


1100
Obtain Playlist
1102
Generate Playlist Instructions
1104
Identify the Current Application Based on the Playlist Instructions
1106
Is the Current Application in the Device?
1108
No
Download the Current Application 1405
1110
Yes
Open/Activate Current Application
1112
Close/Deactivate Previous Applications (if any)
1114
Pass Instructions to Play the Current Song
1116
Receive an Indication that the Current Song has been Played
1118
Identify the Next Application for the Next Song
1120
Current Application=Next Application?
1122
No
Yes

FIG. 11


1200
1202
Obtain album parameters
1204
Determine changes to be made to dynamic album based on the album parameters
1206
Generate album modification instructions
1208
Transmit the album modification instructions to cause the dynamic album to be changed

FIG. 12


1300
1302
Obtain dynamic album version at user device
1304
Compare obtained version with current version of the dynamic album
1306
Version current?
1308
Generate modification instructions
1310
Provide modification instructions to cause dynamic album to be modified

FIG. 13


1400
1410
Artist 1
Album 1
2800
1401
Song 1
3011
Song 2
234
Song 3
115
Song 4
5209
Song 5
305
Song 6
181
Song 7
899
Song 8
2200
1402
Album 2
Artist specific application #2
Artist specific application #3
1404
My Music
1406
1408A
1408B
1408C
3
2
00:55
01:09
1408

FIG. 14


1500
1510
Alerts
Alertlist
2800
Excusive sound loop... 5m 3011
Concert fans, photo 20m 234
Photos at the Awards... 1h 115
Do you like this tune? 1h 5209
Filming our new Single 5d 305
Sound clip, out takes 6d 181
Sound clip, for fun 6d 899
Being silly group photo 07Jul 2200
Sound clip, do you like? 21Jun 576
Photoshoot for Magazine 2 14Jun 211
Sound clip, testing new sound 07Jun 123
Photoshoot for Magazine 21May 32
3
00:55
01:09

FIG. 15


1600
Menu
Back
2800
1601
1602
1603
1601A
Alerts
Hearts
Rewards
1604
1605
1606
www
Artists
Playlist
Escapemusic
1607
1608
1609
2
1
3
Badges
Fanboard
Purchases
Login

FIG. 16


1700
1704
1705
1706
Alerts
Alertlist
2800
1701
1702
M O N S T E R
My New Single
We are recording our new single! Stay tuned for soundclips and pics! We'll send you sneak peaks exclusively here!
1703
Send

FIG. 17


1800
Rewards
Back
2800
1801
Free Ringtone
'Song 1'
Open
1802
Album 1 Photoshoot
10000
1803
VIP Backstage Pass
22.08.14 Concert
8000
1804
Follow Me
On Twitter
6000
1805
Exclusive Chat
at the Recording Studio
1000
1806
Autographed Photo
On the beach
1000

FIG. 18


1900
Fanboard
Back
2800
1 - Momo
38800
2 - RazLove
12800
3 - RichieRich
8827
4 - Anne
5700
5 - Valerie
3200
6 - Marxxx
2900
7 - Michaelangelo
1287
8 – Big Dipper
987

FIG. 19


2000
Alerts
Alertlist
2800
2001
2002
Artist 1
07Jun
Subject Title of Alert: We are recording our new single! Stay tuned for soundclips and pics!
2003
Your Comment...
2004
Fan 1
this is hot, great music love it. Cant wait to hear more...
Artist 1
haha we agree
Fan 2
I love 'Song 1'. Looking forward to more
Fan 3
Amazing song. I listen to it all the time. When can we hear more songs
00:55
01:09

FIG. 20




FIG. 21


2200
Artist 1
Album 1
2800
Search Sites...
2201
Artist 1
Favorite sites this week!
Artist 1
Artist 2
Artist 3
Artist 4
Artist 5
Artist 6
2202
You
Tube
Instagram
You Tube
Twitter
2203

FIG. 22

# SYSTEM AND METHOD FOR GENERATING ARTIST-SPECIFIED DYNAMIC ALBUMS

## RELATED APPLICATIONS

This application is related to U.S. patent application Ser. No. 14/519,125, entitled "System and Method of Creating and Managing Entity-specific Applications in an Integrated Platform", filed on Oct. 20, 2014; U.S. patent application Ser. No. 14/519,129, entitled "System and Method for providing individual client applications for artist-specific content", filed on Oct. 21, 2014; U.S. patent application Ser. No. 14/519,132, entitled "System and Method for facilitating co-play and download of artist specific client applications via user-provided playlists", filed on Oct. 21, 2014; and U.S. patent application Ser. No. 14/519,171, entitled "System and Method for facilitating cross-application functionality among artist specific client applications", filed on Oct. 21, 2014, all of which are incorporated by reference herein in their entireties.

## FIELD OF THE INVENTION

The invention relates to systems and methods of generating artist-specified dynamic albums that include music that may be changed with or without intervention by a user at a user device at which a dynamic album has been stored.

## BACKGROUND OF THE INVENTION

The music industry has been evolving as technology provides greater access to music created by artists (e.g., musicians, singers, bands, etc.). For example, music downloads and streaming services have created different models of providing music and other content. However, while providing easier access to music, these different provisioning models have had adverse effects on artists and fans (e.g., users) alike and also fail to integrate music with other content created by the artist.

For example, individual artists have been experiencing diminishing returns on the songs and albums they create. Various factors such as illegal music download and a la carte purchase of individual songs have contributed to this decline. For users, they must continue to purchase music downloads (or illegally obtain music) or subscribe to streaming services, which requires use of network bandwidth. Such network bandwidth places a burden on streaming services and also requires fans to use oftentimes expensive network services (whose availability may be erratic) and increased battery usage when streamed to mobile devices.

Furthermore, artists have been increasingly using social media (e.g., FACEBOOK, TWITTER, INSTAGRAM, etc.) and other content services to provide artist content to users. However, conventional music provisioning services typically ignore this content, requiring users to separately access music services and social media and other content services. Thus, even though fandom is ubiquitous in the music industry, conventional music delivery services typically ignore this information. What's more, each social media platform typically monetizes an artist's social media account by collecting advertising and other fees related to user interaction with the social media account, while providing little to no compensation to the artist in return.

Additionally, there is conventionally little to no connection between actual use (e.g., playback) of songs to income. For instance, in a content streaming model, payment is typically inversely related to usage because payment to artists is typically fixed regardless the number of times an artist's song is



streamed, resulting in decreased revenue per stream as the number of streams increases. In a download model, after the initial payment for download, a given song may be played without further monetization opportunities.

Still further, once downloaded or streamed, artists typically lack control over music consumed by the user. Such lack of control prevents the artist from easily providing a new song, deleting an existing song, and/or otherwise exercising control over the music provided to their users.

Another problem of streaming services is that each individual artist whose music is streamed has little to no motivation to promote the streaming service (because they have little to no financial incentive to do so). These and other drawbacks of conventional content delivery (in particular music delivery) services exist.

## SUMMARY OF THE INVENTION

The invention addressing these and other drawbacks relates to systems and methods of generating artist-specified dynamic albums that include music that may be changed with or without intervention by a user at a user device at which a dynamic album has been stored, according to an implementation of the invention.

A dynamic album may include a set of songs provided through an artist specific application installed at a user device. An artist specific application may be created and branded for an artist that provides artist content such as music to users through the artist specific application. The artist specific application may facilitate monetizing and maintaining control over the artist content, such as music in the form of a dynamic album.

A dynamic album may be stored at a user device. Nevertheless, the system may modify the set of songs without intervention by the user of user device. Thus, while a user may be able to listen to a dynamic album at the user device even without a network connection, the system may maintain control over the dynamic album. In some implementations, the dynamic album may be subject to one or more music leases that, upon expiration, renders the dynamic album or portions thereof to be unplayable.

The system may modify the dynamic album based on one or more album parameters that specify a change to be made to the set of songs. For example, the one or more album parameters specify the removal of one or more songs from the dynamic album, the addition of one or more new songs, the replacement of one or more songs, a rearrangement of (e.g., shuffling) the order of one or more songs, and/or other change to the set of songs.

The album parameters may be specified by an artist. In this manner, an artist may use the features and functions of a dynamic album to send music and/or other updates to the dynamic album. For example, the artist may introduce new songs, delete old songs, replace one version of a song with another version of the song, present snippets of songs in production, re-arrange an order in which the songs of a dynamic album are played, specify a first song to be played, and/or otherwise change the dynamic album. As another example, the artist may send an audio and/or a video message (e.g., commentary, uncut versions of the song, outtakes, etc.) to be played in association with the dynamic album.

These and other objects, features, and characteristics of the system and/or method disclosed herein, as well as the methods of operation and functions of the related elements of structure and the combination of parts and economies of manufacture, will become more apparent upon consideration of the following description and the appended claims with

reference to the accompanying drawings, all of which form a part of this specification, wherein like reference numerals designate corresponding parts in the various figures. It is to be expressly understood, however, that the drawings are for the purpose of illustration and description only and are not intended as a definition of the limits of the invention. As used in the specification and in the claims, the singular form of "a", "an", and "the" include plural referents unless the context clearly dictates otherwise.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** illustrates a system for creating and managing entity-specific applications that each relates to an individual entity, integrates the entity's content, and connects fans with the individual entity through multimedia experiences provided through the entity-specific application, according to an implementation of the invention.

FIG. **2** illustrates a flow diagram depicting a process of providing a music lease and content to an artist specific application, according to an implementation of the invention.

FIG. **3** illustrates a flow diagram depicting a process for receiving a music lease and content at an artist specific application executing at a user device, according to an implementation of the invention.

FIG. **4** illustrates a block diagram depicting system instructions for providing a platform for integrating artist specific applications, according to an implementation of the invention.

FIG. **5** illustrates a flow diagram depicting a process of obtaining, storing, and querying content related to different artist specific applications at a computer system coupled to different artist specific applications executing at different user devices, according to an implementation of the invention.

FIG. **6** illustrates a flow diagram depicting a process of querying content associated with an artist specific application from a user device, according to an implementation of the invention.

FIG. **7** schematically illustrates a non-limiting example of a playlist, according to an implementation of the invention.

FIG. **8** illustrates a flow diagram depicting a process of switching artist specific applications to play a playlist, according to an implementation of the invention.

FIG. **9** illustrates a flow diagram depicting a process of switching artist specific applications to play a playlist as controlled locally at a user device, according to an implementation of the invention.

FIG. **10** illustrates a flow diagram depicting a process of switching artist specific applications to play a playlist, according to an implementation of the invention.

FIG. **11** illustrates a flow diagram depicting a process of switching artist specific applications to play a playlist, according to an implementation of the invention.

FIG. **12** illustrates a flow diagram depicting a process for changing a dynamic album at user devices based on album parameters received from an artist, according to an implementation of the invention.

FIG. **13** illustrates a flow diagram depicting a process for accounting for different versions of a dynamic album associated with an artist specific application at a user device, according to an implementation of the invention.

FIG. **14** illustrates a non-limiting example of a screenshot of a unified player interface that plays music from an artist specific application and/or music not associated with the artist specific application, according to an implementation of the invention.



FIG. **15** illustrates a non-limiting example of a screenshot of an interface for displaying content updates, according to an implementation of the invention.

FIG. **16** illustrates a non-limiting example of a screenshot of an interface for displaying a plurality of menu icons associated with an artist specific application, according to various implementations.

FIG. **17** illustrates a non-limiting example of a screenshot of an interface for displaying messages received by the user, according to an implementation of the invention.

FIG. **18** illustrates a non-limiting example of a screenshot of an interface that facilitates redemption of one or more loyalty points for a reward, according to an implementation of the invention.

FIG. **19** illustrates an example of the fan board display, according to an implementation of the invention.

FIG. **20** illustrates a non-limiting example of a screenshot of an interface **2000** for displaying the discussion board to which users and the artist may post messages, including content such as music, according to an implementation of the invention.

FIG. **21** illustrates a non-limiting example of a screenshot of an interface for displaying the affiliation of the artist with one or more merchandise items, according to an implementation of the invention.

FIG. **22** illustrates a non-limiting example of a screenshot of an interface for displaying targeted advertisements in the artist specific application, according to an implementation of the invention.

## DETAILED DESCRIPTION OF THE INVENTION

FIG. **1** illustrates a system **100** for creating and managing entity-specific applications that each relates to an individual entity, integrates the entity's content, and connects fans with the individual entity through multimedia experiences provided through the entity-specific application, according to an implementation of the invention. An entity may include an individual performer (e.g., a singer), a group of performers (e.g., a band), a comedian, a celebrity, an item, and/or other subject to which an application relates.

System **100** may create and manage various types of entity-specific applications that integrate different types of content. For example, a movie-specific application that may be specific to a particular movie or a product-specific application that may be specific to a particular product may be created. For convenience, artist specific applications that provide music and other content related to an artist such as a musician/singer will be described herein. Furthermore, as used herein, the terms "song" and "music" may be used interchangeably and may refer to a musical performance that may be replayed, whether or not such musical performance includes lyrics sung by the artist.

Using the system, a given artist may create an artist specific application (hereinafter also referred to as "ASA") that includes music and other content related to the artist. Users may download the ASA (as well as other ASAs of other artists) or otherwise obtain and execute the ASA at a user device in order to listen to the artist's music and consume other content related to the artist through the ASA. Thus, instead of a single application that streams music from multiple artists, each ASA may relate to an individual artist.

In some implementations, a given artist may create other subject specific applications, such as a first album specific application that relates to one of the artist's album and a

second album specific application that relates to another one of the artist's albums. The artist may create other subject specific applications as well.

System Overview

System **100** may facilitate a new paradigm of content management, provision, and ownership of multimedia content. Specifically, system **100** may provide an "in-stream" content management and provisioning platform in which music and/or other content is downloaded to and streamed from ASAa user device executing an application provided by the in-stream content management and provisioning platform. For example, the content such as music may be downloaded to a user device but not be separately available, other than through a corresponding ASA. Of course, the artist may continue to make the music available through conventional distribution channels (e.g., via download) separate from the in-stream content management and provisioning platform as well.

In an implementation, the music may be integrated with (e.g., compiled or otherwise encoded into) the ASA such that when the ASA is downloaded to the user device, a binary or other instructions that encode the music is downloaded to the user device as part of the ASA but is not separately available to be played other than through the ASA. In this implementation, the music may not be downloaded to the user device as a separate file, but is instead integrated within an ASA executable file so that the user does not have access to the given song file separate from the ASA. In another implementation, a given song may be encrypted or otherwise provided as a separate binary that only the ASA may play.

Because the music may not be accessed or played other than through a corresponding ASA, the system may exercise control over the music, via the ASA, even though information encoding the music is downloaded to and stored at the user device. For example, the system may remove or otherwise render unplayable a song from the user device. In the foregoing example, the user may not be provided with ownership rights over the music, yet possesses a copy of the music (e.g., information that encodes the music) at the user device such that that music may be played from local storage without a network connection.

In some implementations, the music may be provided to the user as an in-stream allotment (also referred to hereinafter interchangeably as a music lease) that must be renewed before expiration. If the system has not received and approved a request to renew the music lease from a given ASA installed at a user device, the system may cause the music to be removed or otherwise rendered unplayable. For example, an ASA may be programmed to periodically request a new lease from computer system **110**. If the new lease is not granted or the ASA cannot communicate with the computer system **110** before the music lease has expired, the ASA may not play some or all of the music associated with the ASA (e.g., the ASA may delete or otherwise render the music unplayable). In some instances, a music lease may relate to all music stored with an ASA such that all music stored with the ASA will have the same expiration time. In other instances, a music lease may relate to only a subset of the music stored with an ASA such that different music will have different expiration times.

Using the system, music may be provided to the user through an ASA based on a freemium model, giving the user an ability to store and play music locally without a network connection (while the music lease remains valid) and yet without expressly paying for a music download.

System **100** may also facilitate the monetization by the artist of artists' content. For example, by monitoring usage and other activity related to the ASA, the system may provide



an individual artist with a revenue share model that shares income derived from the use of the ASA between the artist and an entity that operates the system. The income may be based on advertising-related income (e.g., resulting from ads placed on the ASA), purchases made through an ASA or the ecosystem, and/or other income sources related to use of the ASA for an artist. Such income may be shared between the operators of the system and an artist

Each ASA may communicate with other ASAs also installed at user device **170**, computer system **110**, other user devices **170** that include at least one ASA installed thereon, and/or other devices. In this manner, system **100** may facilitate cross-application functionality across the same or different ASA installed at multiple devices.

To facilitate a cross-application ecosystem, the system may obtain, store, or otherwise access content such as music, social media posts, rewards, and/or other information from different ASAs. In this manner, such content may be searched for and provided to individual ASAs that may otherwise be unrelated to other ASAs. In this manner, the system may facilitate a unified ecosystem of different ASAs. Furthermore, the system may categorize different ASAs into different groups based on musical genres, fan base (e.g., fan demographics), interests, and/or other categorizations, thereby enabling searches for (and discovery of) new and additional artists.

The system may also support cross-application analytics. For example, the system may obtain usage and analytics information across different ASAs in order to assess popularity or trends. This may provide artists, studios, an operator of the system, and/or other entities with insight into user interests across a broad spectrum of ASAs.

In an implementation, the system may facilitate the creation and use of cross-application playlists. The system may allow the creation of a playlist that includes a plurality of songs from different ASAs to be played in a particular order (including a preset or random order). Because a given song may only be played/access from a corresponding ASA, a playlist that includes songs from different ASAs may cause ASAs to be opened or otherwise activated when a song included therein is next in line to be played.

ASAs that have already played a song in the playlist may be closed to minimize a memory footprint (or each ASA may remain open but be placed in a de-activated or unfocused state). Alternatively or additionally, the system may cause such opening and closing of ASAs in order to facilitate appropriate monetization by each artist in cases where opening or activating a given ASA **124** contributes to a potential payment to be made to the artist.

A playlist may be used to play songs locally at user device **170**, share the songs with other users (which may encourage the other users to download ASAs **124** included in the playlist that are not already installed at the other users' device), and/or for other purposes.

In an implementation, the system may create and maintain one or more dynamic albums. A dynamic album may include a set of songs provided through an ASA installed at user device **170**. The dynamic album may be stored at the user device **170** (e.g., in the manner as described herein with respect to music). Nevertheless, the system may modify the set of songs without intervention by the user of user device **170**. Thus, while a user may be able to listen to a dynamic album at the user device **170** even without a network connection, the system may maintain control over the dynamic album. In some implementations, the dynamic album may be subject to one or more music leases as described herein.

The system may modify the dynamic album based on one or more album parameters that specify a change to be made to the set of songs. For example, the one or more album parameters specify the removal of one or more songs from the dynamic album, the addition of one or more new songs, the replacement of one or more songs, a rearrangement of (e.g., shuffling) the order of one or more songs, and/or other change to the set of songs.

The album parameters may be specified by an artist. In this manner, an artist may use the features and functions of a dynamic album to send music and/or other updates to the dynamic album. For example, the artist may introduce new songs, delete old songs, replace one version of a song with another version of the song, present snippets of songs in production, re-arrange an order in which the songs of a dynamic album are played, specify a first song to be played, and/or otherwise change the dynamic album. As another example, the artist may send an audio and/or a video message (e.g., commentary, uncut versions of the song, outtakes, etc.) to be played in association with the dynamic album.

System Components

Other uses of system **100** are described herein and still others will be apparent to those having skill in the art. Having described a high level overview of some of the system functions, attention will now be turned to various system components that facilitate these and other functions.

System **100** may include a computer system **110**, one or more databases **130**, an application marketplace **140**, one or more social media providers **150**, one or more advertising providers **160**, one or more user devices **170**, and/or other components.

Computer System **110**

Computer system **110** may generate and customize an ASA based on input from an artist, renew music leases, provide and communicate updates and new content to ASAs installed at user devices, facilitate communication between system users (e.g., artists, fans, etc.), obtain usage metrics from ASAs installed at user devices, and manage an ecosystem of ASAs for different artists. By communicating with ASAs installed at user devices, the system may exercise control over the music and other content available at the ASAs.

To facilitate these and other functions, computer system **110** may include one or more processors **112**, one or more storage devices **114**, and/or other components. Processor(s) **112** may be programmed by one or more computer program instructions, which may be stored in storage device(s) **114**. The one or more computer program instructions may include, without limitation, a platform management application **120** and/or other instructions that program computer system **110**. As used herein, for convenience, the various instructions will be described as performing an operation, when, in fact, the various instructions program the processors **112** (and therefore computer system **110**) to perform the operation.

FIG. **2** illustrates a flow diagram depicting a process **200** for providing a music lease and content to an ASA, according to an implementation of the invention. The various processing operations and/or data flows depicted in FIG. **2** (and in the other drawing figures) are described in greater detail herein. The described operations may be accomplished using some or all of the system components described in detail above and, in some implementations, various operations may be performed in different sequences and various operations may be omitted. Additional operations may be performed along with some or all of the operations shown in the depicted flow diagrams. One or more operations may be performed simultaneously. Accordingly, the operations as illustrated (and described in greater detail below) are exemplary by nature and, as such, should not be viewed as limiting.

In an operation **202**, a communication may be received from an ASA **124** executing on a user device **170**. The communication may include an identity of ASA **124** (e.g., an application identifier), an identity of user device **170**, and/or other identification information.

In an operation **204**, a determination of whether to provide a music lease renewal may be made. The determination may be based on whether the artist wishes to continue to allow certain music to be played, whether the particular ASA **124** executing on a user device **170** should be allowed to have a renewed music lease (e.g., older versions of an ASA may not be allowed to have a renewed music lease to encourage an update to a newer version), and/or other reason.

If a music lease is to be renewed, in an operation **206**, the music lease renewal may be provided to ASA **124**. The music lease renewal may include an indication of a length of time that the lease is renewed, an expiration time, a number of times music governed by the music lease is allowed to be played, a simple indication to renew the lease, and/or other indication that the music lease is renewed. In some implementations, the music lease renewal may include a code that when decoded at ASA **124** causes the lease renewal.

If a music lease is not to be renewed, in an operation **208**, an indication may be provided to ASA **124** that the music lease is not to be renewed. In some instances, a reason for the refusal may be provided so that ASA **124** may remedy any issues (e.g., by causing or suggesting that a newer version of the ASA **124** be downloaded/installed).

In an operation **210**, updated content may be obtained. For instance, content such as artist-provided content (e.g., messages, multimedia such as songs, endorsements, etc.), rewards, social media content, and/or other content related to the artist may be obtained. In some implementations, at least some of the foregoing content gathering may occur via a process executing at ASA **124**.

In an operation **212**, the updated content may be provided to ASA **124**, which may integrate and display the content through one or more of its interfaces.

Generating ASAs

Having described an overview of interactions between computer system **110** and an ASA **124** executing at a user device **170**, generation of an ASA **124** based on artist input will now be described.

In an implementation, platform management application **120** may generate an ASA based on one or more application parameters, which may be provided by an artist, a human developer working on behalf of an entity that operates system **100**, and/or other entity. To receive the application parameters from an artist, platform management application **120** may expose an interface, such as a website, used by the artist to provide the application parameters.

The application parameters may specify the content, functionality, appearance, and/or other characteristic of an ASA. For example, the application parameters may specify/include one or more "skins" (e.g., templates) used to specify an overall appearance, one or more songs to be included in the ASA, one or more social media accounts from which to aggregate content, one or more rewards or loyalty specifications, and/or other parameters that may be used to specify and customize an ASA.

Platform management application **120** may obtain and use a template that specifies an appearance (e.g., "look and feel") for an ASA. A given artist may select from among several appearances for the application and may specify that a particular template be used. Alternatively or additionally, each

skin may specify content that should be included in the application. For instance, one skin may specify that social media content should be made available while another skin may specify that social media content should be excluded. Other appearance and/or content customizations may be made included in a template as well.

Platform management application **120** may obtain each song to be included in an ASA. For example, each song may be obtained from the artist, an entity acting on behalf of the artist (e.g., a studio, record label, etc.), and/or other entity. Platform management application **120** may compile each song into the ASA being generated or otherwise make each song not playable except through the ASA.

In an implementation, platform management application **120** may encrypt a song file for a given song using, without limitation, the Advanced Encryption Standard ("AES"). Platform management application **120** may then encode the encrypted song file into an ASA **124**. For example, PMA **120** may use compilation procedures specified by operating system vendors (e.g., iOS, Android, Windows, etc.). Upon compilation, PMA **120** may obfuscate or otherwise secure code using obfuscation and/or other techniques (e.g., using ProGuard, DexGaurd, etc.).

Platform management application **120** may obtain a listing of social media accounts from which to aggregate social media content posted by the artist to provide such content through the ASA being generated. In this manner, the artist may specify social media accounts from which to aggregate social media content.

Platform management application **120** may obtain a loyalty specification that describes a loyalty program made available through the ASA. Generally speaking, the loyalty program may provide one or more types of loyalty items to users to incentivize continued use of the ASA. Such continued use, in turn, enhances revenue opportunities for the system and the artist through advertisements and other monetization strategies that are based on the use of the ASA.

The loyalty specification may be customized by the artist, and may include one or more loyalty parameters that specify how a user may acquire or spend loyalty awards. For example, the loyalty parameters may specify whether and how much real currency may be used to purchase a given loyalty award, conditions that must be satisfied by a user in order to accrue a given loyalty award, and/or other specifications related to loyalty awards. In this manner, an artist may customize the types of loyalty awards offered as well as how a user may accrue and/or spend such awards.

In some implementations, the system may require that a certain number of types of loyalty awards be made available by the artist before an ASA is allowed to be release for download by users. In this manner, the system may ensure that a sufficient number of different types of loyalty awards are to be made available to users to provide the users with a variety of available awards, keeping the users engaged with the ASA.

In an implementation, platform management application **120** may index and store content and customizations included in or associated with an ASA in a content database, such as a database **130**. Each content item (e.g., song, message, loyalty program item, etc.) may be assigned with a unique identifier and stored in the content database. Such an index and storage may facilitate rapid identification of the content associated with a given ASA and cross-application functions such as cross-application search functions described herein.

In addition to customizations that a given artist may make to his or her ASA, each ASA may include a core set of system functions that facilitate the various features and functions



described herein. The core set of system functions is described further below with respect to the system instructions.

User Device **170**

Once a given ASA is generated, the system may make the application available for download through an application marketplace **140** and/or other channel. For instance, user device **170** may download or otherwise store and install one or more ASAs each corresponding to an individual artist. A user who wishes to listen to the music of multiple artists (and/or obtain content related to such artists) may download each artist's ASA to a user device **170**, which may execute multiple ASAs.

To facilitate these and other functions, user device **170** may include one or more processors **172**, one or more storage devices **174**, and/or other components. Processor(s) **172** may be programmed by one or more computer program instructions, which may be stored in storage device(s) **174**. The one or more computer program instructions may include an ASA **124** and/or other instructions. In addition to one of more of system instructions **122** described below, ASA **124** may provide one or more user interfaces that collectively provide interfaces through which artist content is presented. The one or more user interfaces may include, for instance, a media player that plays music, videos, etc., a social media browser that displays social media content aggregated from various social media platforms (which may be integrated into a single display or separately navigable displays that each is displays social media content from a corresponding social media provider), a loyalty display that displays loyalty items, a fan board display, a network—e.g., Internet—browser that can monitor and display previous visit histories, and/or other displays to provide artist content described herein.

FIG. **3** illustrates a flow diagram depicting a process **300** for receiving a music lease and content at ASA **124** executing at user device **170**, according to an implementation of the invention.

In an operation **302**, ASA **124** may be launched or otherwise be activated (e.g., brought into a foreground/active state from a background/inactive state). In some implementations, upon being launched or otherwise activated, ASA **124** may attempt to communicate with computer system **110**. Alternatively or additionally, ASA **124** may attempt such communication at other times.

In an operation **304**, ASA **124** may determine whether a communication was established and/or whether a network connection is available. If the communication is established, in an operation **306**, ASA **124** may determine whether a music lease renewal has been received from computer system **110**. If the music lease renewal was received, in an operation **308**, ASA **124** may update the music lease based on the music lease renewal. In an operation **312**, ASA **124** may begin playing the music associated with the music lease.

Returning to operation **304**, if a communication has not been established, in an operation **310**, ASA **124** may determine whether the music lease has expired. If the music lease has not expired, in an operation **312**, ASA **124** may begin playing the music associated with the music lease. If the music lease has expired, ASA **124** may skip operation **312**, and proceed to operation **314**. In some implementations (not illustrated in FIG. **3**), if the music lease has expired, ASA **124** may render itself inoperable such as by shutting down or causing itself to be uninstalled from user device **170**.

Returning to operation **306**, if the music lease has not been renewed, ASA **124** may proceed to operation **310** and processing may proceed as previously described with respect to operation **310**.

In an operation **314**, ASA **124** may determine whether any updates have been received from computer system **110**. If updates have been received from computer system **110**, ASA **124** may apply the updates for display to the user in an operation **316**. If no updates have been received from computer system **110**, ASA **124** may skip operation **316**.

In some implementations, an update from computer system **110** may include a new song to be added (e.g., through a dynamic album as described herein). In these implementations, ASA **124** the song may be encoded as information to be incorporated into the code or binary of the ASA **124** to render the song unusable other than through ASA **124**. In other implementations, ASA **124** may decrypt or otherwise decode the song in a manner that the song is unusable other than through ASA **124**. In some implementations, the new song to be added may be encrypted by PMA **120** and downloaded to user device **170**, where ASA **124** decrypts and provides the song. In some implementations, PMA **120** may generate an updated version of AMA **124** that includes the new song (or other dynamic album changes) for updating a current version of AMA **124** installed at a user device **170**. In this implementation, the PMA **120** may cause the updated AMA **124** to be incorporated with or otherwise replace the current version of AMA **124** using an application installer associated with user device **170**.

In an operation **318**, ASA **124** may determine whether any locally-obtained updates are available (e.g., in instances where ASA **124** aggregates social media content related to the artist, or otherwise obtains other content related to the artist or other users). If such updates are available, ASA **124** may apply the updates for display to the user in an operation **320**.

In an operation **322**, ASA **124** may display content related to the artist, including any applied updates. Such content may be displayed using one or more interfaces, such as those illustrated with respect to one or more screenshots described herein.

In an implementation, a user may be granted some level of control over the content such as music provided through an ASA **124**. For example, the user may select songs that are displayed in a listing of songs (or may cause an ASA **124** to remove one or more songs to save disk space). In some implementations, the user may be permitted to exercise such control under certain conditions. For example, the user may be permitted to modify content only if that content has not been interacted with for a certain period of time. In a particular example, a user may be permitted to delete a song only if that song has not been played within the last month.

System Databases

In an implementation, computer system **110**, user device **170**, and/or other system components may access one or more database(s) **130**, which may include an application template database, an artist database, a user database, a reward database, a content database, and/or other databases.

Application Marketplace **140**

Application marketplace **140** may include application markets that make available for download ASAs. For example, application marketplace **140** may include, without limitation, the GOOGLE PLAY store, APPLE APP store, WINDOWS PHONE store, BLACKBERRY WORLD, and/or other application markets. System **100** may make ASAs available for download from an application marketplace **140**. As such, users may download ASAs from application marketplace **140**. Alternatively or additionally, system **100** may make ASAs available for download from other sources, such as directly from computer system **110**.

Social Media Providers **150**

Social media providers **150** may include, for example, social media platforms (e.g., FACEBOOK, TWITTER, INSTAGRAM, FLICKR, YOUTUBE, etc.), and/or other providers that generally distribute content uploaded by users to be consumed by other users. The content may be generated by content sources such as individuals, corporations, and/or other entities that may create content. Artists and users may post social media content to one or more social media providers **150**, from which system **100** may aggregate and present through ASAs as described herein.

Advertisement Providers **160**

Advertisement provider(s) **160** may include entities that wish to promote an item such as a good or service. The system may obtain advertisements to from advertisement provider(s) **160** in order to leverage the ASA ecosystem to provide the advertisements. Advertisements may include promotional information, incentive information, marketing messages, and/or other information used to incentivize or otherwise introduce a user to a product or service.

Having described an overview of the system components, attention will now be turned to various system functions that facilitate connecting fans and artists through ASAs.

System Instructions

Referring to FIG. **4**, which illustrates a block diagram depicting system instructions **122**, in an implementation, system instructions **122** may include various sets of instructions that program computer system **110** and/or user device **170**. In other words, platform management application **120** and/or an ASA **124** may include all or a portion of system instructions **122**.

System instructions **122** may include different sets of instructions, such as a command manager **402**, an update manager **404**, a usage analytics engine **406**, a loyalty program manager **408**, a social media manager **410**, an advertisement manager **412**, an artist endorsement manager **414**, a fan board manager **416**, a discussion board manager **418**, an accounting manager **420**, a cross-application manager **422**, a playlist manager **424**, a dynamic album manager **426**, and/or other instructions.

In an implementation, a given set of instructions described with respect to system instructions **122** may include a version that executes on computer system **110** (through platform management application **120**) and a version that executes on user device **170** (through ASA **124**). The version executing on computer system **110** may communicate with the version executing on user device **170**. Furthermore, in an implementation, a version that executes on a first user device **170** may communicate with a version that executes on a second user device **170**. Thus, the various system instructions may facilitate collaboration between computer system **110** and user device **170**, and/or between one user device **170** and another user device **170**.

Receiving Commands from Artists and Other Users

In an implementation, command manager **402** may obtain and execute one or more commands to be performed with respect to an ASA. The one or more commands may relate to music or content that should be changed such as being updated, added, and/or removed from an ASA. For example, the one or more commands may be received from an artist that may wish to change the music or other content provided at the ASA of the artist. The command may relate to music, messages, loyalty items, and/or other content to be changed.

Command manager **402** may obtain the one or more commands in various ways. For example, command manager **402** may receive the one or more commands via a website exposed by system **100** that provides an interface used to receive changes to be made, via an electronic communication (such

as email, Short Message Service ("SMS") message, Multimedia Message Service ("MMS") message, etc.), an interface provided by an ASA, and/or other communication channel.

In whichever manner the one or more commands are received, a command may identify content that is to be changed. For example, when music is to be added (or otherwise rendered playable), the command may be associated with the music to be added. When music is to be deleted (or otherwise rendered unplayable), an identification of the music to be deleted may be provided with (e.g., specified by) the command. In some instances, the content, such as music, to be added may be stored by a content database (e.g., a database **130**) such that an identifier of the content is sufficient to cause the content to be added, in which case command manager **402** may retrieve the content from the content database based on the identifier. In other instances, the content may be supplied along with the command. For example, to add new music, an artist may attach the new music to an MMS message with a command such as "add new music." Alternatively or additionally, the artist may simply specify an identification of the music to be added, assuming the system already has the music to be added.

Other commands may be used as well, such as a command to provide a message to fans, add a particular loyalty reward, and/or other command to cause other changes to occur. In some implementations, fans or users other than an artist may provide commands. In these implementations, command manager **402** may execute only a limited set of commands that are available for such users (while providing a higher level of control to artists for their respective ASAs). For instance, command manager **402** may allow other users to provide comments/messages on a message board displayed by an ASA, but not add music to the application. To distinguish between an artist and other users for such access control, command manager **402** may require user authentication (e.g., password and/or other shared secret) or provide an artist with a secret communication channel (e.g., a particular phone number to which to send text messages, or an unpublished website) for the artist.

Updating Content at ASAs

In an implementation, content manager **404** may obtain, manage, and store content related to an ASA. For example, content manager **404** may maintain a date when a message, a reward, music, and/or other content is received from an artist (or from a user). Content manager **404** may store the information in a content database for later retrieval.

Monitoring Usage and Generating Usage Analytics

In an implementation, usage analytics engine **406** may monitor and/or analyze user activity related to an ASA. For example, usage analytics engine **406** may monitor a number of times or duration that an ASA has been opened/activated, a number of times or duration a song has been played by the ASA, a number or duration in which social media content is accessed, a number of social media "likes" from the user, a number or value of purchases made, and/or other user activity in relation to an ASA that may indicate usage.

A version of usage analytics engine **406** executing on a user device **170** (e.g., via an ASA) may monitor the user activity and store the user activity in a local memory. In some implementations, a version of usage analytics engine **406** executing at the user device **170** may report the user activity to computer system **110** (e.g., to a usage analytics engine **406** executing at computer system **110**).

A version of usage analytics engine **406** executing on computer system **110** may receive the user activity from various ASAs **124**. For example, the user activity may be received from a first ASA **124** that relates to a first artist as well as user activity from a second ASA **124** that relates to a second artist. Thus, the version of usage analytics engine **406** executing on computer system **110** may compile usage activity across a wide range of different ASAs **124**, whether or not such ASAs relate to a single artist.

The user activity may be used by computer system **110** in various ways such as by ranking ASAs, ranking content within ASA, providing loyalty items, and/or other purpose.

In an implementation, platform management application **120** may use the user activity to rank ASAs **124** based on various metrics related to user activity. For example, platform management application **120** may rank different ASAs **124** based on a number of downloads, a number of times or duration a song has been played by the ASA, a number or duration in which social media content is accessed, a number of social media "likes" from the user, a number or value of purchases made, and/or other user activity in relation to an ASA. Likewise, platform management application **120** may use the user activity to rank particular content such as songs, social media posts, etc., in a similar manner. Thus, platform management application **120** may generate listings of what ASAs or content are currently popular (e.g., within the past week, month, or other time period), trending among users, and/or otherwise gauge which applications or content are successful.

Platform management application **120** may use such popularity/trending information to provide users with what may be of interest to the user. For instance, a user may be provided with an indication of a recently trending ASA, which may encourage the user to download that application.

In an implementation, platform management application **120** may use the user activity to determine whether a loyalty item should be awarded to a user.

Managing Artist Specific Loyalty Programs and Awarding the User with Loyalty Items

In an implementation, loyalty program manager **408** may award loyalty items to users in association with an ASA. A loyalty item may include a real or virtual item having a real or perceived value provided by the system, artist, and/or other entity. For example, a loyalty item may include, without limitation, a loyalty point, an achievement, a reward, and/or other items that may be obtained by the user in association with an ASA.

Loyalty program manager **408** may provide a loyalty item to the user as a reward for performing one or more user activities and/or as a purchase by the user using real or virtual currency. Loyalty program manager **408** may store (at user device **170** and/or at computer system **110**) a user account of a user that tracks and maintains loyalty items provided to the user.

The user activities may include an action performed by the user in association with an ASA. For example, a user activity may include, without limitation, listening to a song, commenting on a message board, providing "likes" on content, launching or otherwise making active an application-specific application, and/or performing other activities with respect to the application-specific application.

Virtual currency may include other loyalty items (e.g., a reward may be purchased with a loyalty point and/or with real currency). For example, loyalty program manager **408** may facilitate redemption of one or more loyalty points for a reward and/or other loyalty items. In some instances, a given loyalty item may be redeemed only for another loyalty item associated with the same ASA. In other instances, a given loyalty item may be redeemed across different ASAs. In some implementations, a loyalty item may not be purchased. For example, certain loyalty items such as achievements may only be earned based on use of an ASA.

In implementations where loyalty items may be purchased, loyalty program manager **408** may store an indication of such purchase. In this manner, loyalty program manager **408** may distinguish between loyalty items that were earned and loyalty items that were purchased. For example, loyalty program manager **408** may store information used to distinguish between a loyalty point that was purchased versus one that was earned by the user.

Each artist may customize loyalty items that are made available as well as specify how users may accrue the loyalty items (e.g., a number of times that a user must listen to a song in order to obtain a loyalty item and/or an amount of real or virtual currency to obtain a loyalty item).

Loyalty program manager **408** may obtain user activity information that indicates user activities and may award the user with an appropriate loyalty item. In some implementations, loyalty program manager **408** may not provide an indication of the user activities that may be necessary to obtain a loyalty item. In such implementations, a loyalty item may be rewarded to the user as a surprise. In other implementations, loyalty program manager **408** may provide an indication of user activities that may be necessary to obtain an achievement.

Examples of Types of Loyalty Items

Having provided an overview of a loyalty program, specific, non-limiting examples of loyalty items will be described.

In an implementation, loyalty program manager **408** may provide a loyalty point. A loyalty point may indicate a level of user activity with respect to the ASA such that a user having a greater number of loyalty points has more user activity than another user having a lesser number of loyalty points. In some instances, a loyalty point may be redeemed for other loyalty items such as rewards.

In an implementation, loyalty program manager **408** may provide an achievement that corresponds to a particular type and/or volume of a user's activity. Different achievements may be awarded for different types of user activity. For example, an achievement may include an "old school" badge that indicates that the user has listened to an album cover to cover (e.g., that the ASA has played the album cover to cover), a "musical lover" badge that indicates that the user has downloaded more than five ASAs (such a badge may be displayed via all of the ASAs that the user has downloaded), and/or other types of badges. In some implementations, an achievement may not be purchased nor redeemed for other loyalty items. In such implementations, the achievement may indicate an actual level of user activity.

In some implementations, the achievements may be redeemable for rewards and/or merchandise offered from one or more ASAs. In such implementations, the user may redeem the achievements to obtain other loyalty items.

Loyalty program manager **408** may award a user with a reward provided by various entities such as, for example, the artist, the system, third parties, and/or other entities. A reward may include, for example, autographed photos, an exclusive chat opportunity, a wallpaper image, a ringtone, a backstage pass, a social media follow from the artist, and/or other rewards. In other implementations, the system may facilitate the provision of various rewards. The system may store various rewards, either at the server or at the user mobile device.

In some implementations, loyalty program manager **408** may provide different sets of rewards for different sets of users. For example, one set of users may be provided with an opportunity to obtain a first set of rewards while another set of users may be provided with an opportunity to obtain a second set of rewards that are different from the first set of rewards. The different sets of users may be delineated by culture, geography, and/or other characteristic of a set of users. For example, a reward for fans in Japan may include a handshake with the artist or other culturally-specific reward whereas such a handshake award may not be provided to fans in other countries.



In some implementations, loyalty program manager **408** may provide a user-specific reward that is tailored to an individual user. For example, a reward may include a recorded personal greeting to the user from the artist (e.g. "Good morning Sam"), a handwritten note to the user from the artist, and/or other customized reward. The personalized reward may include actual personalized content (e.g., a greeting actually spoken by the artist for the user) and/or content that only appears to be personalized.

In some implementations, a reward may include providing a connection between a user's social media account and an artist's social media account. For example, loyalty program manager **408** may cause a TWITTER account of the artist to "follow" a TWITTER account of the user. The association may be made automatically without intervention by the artist (e.g., loyalty program manager **408** may logon to the TWITTER account of the artist on behalf of the artist to make the connection) or may be via a request made to the artist, who then connects with the user.

Aggregating and Managing Social Media Content

In an implementation, social media manager **410** may aggregate social media content that is relevant to an artist for presentation through an ASA. For example, an artist may specify social media accounts of the artist from which to aggregate social media content. Social media manager **410** may aggregate social media posts from those social media accounts (whether posted by the artist or by other users) and provide them through an ASA for presentation to users. For example, social media manager **410** may post TWEETS from the artist, TWEETS from followers directed to the artist, and/or other social media posts made in relation to the artist's social media accounts. In this manner, users may view social media posts related to the artist using an ASA.

Social media manager **410** may aggregate the social media posts via Application Programming Interfaces ("APIs") exposed by the social media providers. In this manner, social media manager **410** may automatically obtain such posts.

In an implementation, social media manager **410** may obtain new social media posts by tracking a last time (e.g., most recent) that social media posts were provided through an ASA. In this manner, new social media posts may be obtained displayed through the ASA.

In an implementation, social media manager **410** may logon to one or more of the artist's social media accounts on behalf of the artist in order to automatically post social media content. Such automatically posted content may include, for example, promotions related to the artist (e.g., announcement of a new song, album, concert, etc.) and/or other content related to an artist.

In an implementation, a version of social media manager **410** executing at computer system **110** may aggregate and save the social media posts related to an artist. In this manner, a historical record of social media posts may be maintained and used to provide social media posts to ASA.

In an implementation, a version of social media manager **410** executing at user device **170** may aggregate the social media posts at the user device. In this implementation, user device **170** (e.g., ASA executing at user device **170**) may obtain the social media posts directly from the social media providers.

By integrating social media posts of the artist for display through the ASA, the system further facilitate fan engagement and provides an easy "one-stop" solution for providing artist-related content.

Managing Advertisements

In an implementation, advertisement manager **412** may obtain advertisements from one or more advertisement provider(s) **160** for display through an ASA. Certain advertisements may be targeted for presentation at particular ASAs based on user activity. For example, advertisement manager **412** may determine a relevance of a given advertisement based on particular user activity and provide the given advertisement to a particular user device **170** executing an ASA. In an implementation, advertisement manager **412** may determine that all ASAs related to an artist should display a particular advertisement. In this implementation, advertisement manager **412** may identify user devices **170** that have installed or otherwise have used a given ASA and provide the particular advertisement to all of those user devices for display through the given ASA.

The advertisement may be displayed at one or more interfaces of ASA.

In some implementations, the advertisement manager **412** may receive advertisements from the system server. For example, the system server may communicate banner advertisements to be displayed in association with one or more ASA.

Versions of advertisement manager **412** executing at a user device **170** may locally store advertisements at the user device, whether such advertisements are provided from versions of advertisement manager **412** executing at computer system **110** and/or directly from advertisement provider(s) **160**. Such implementations may allow advertisements to be displayed to the user even when user device **170** is offline.

In some implementations, advertisement manager **412** may monitor advertisement result information that indicates an effectiveness of the advertisements provided through an ASA. The advertisement result information may include a number of times a particular advertisement has been displayed, a click-through rate of the advertisement, and/or other information that indicates an effectiveness of the advertisements.

A version of advertisement manager **412** executing at user device **170** may report the advertising result information to a version of advertisement manager **412** executing at computer system **110** for centralized compilation. Such reporting may occur in real time, periodically, and/or at other times. For example, each time an advertisement is clicked or otherwise selected by a user, the version of advertisement manager **412** executing at user device **170** may report the click to the version of advertisement manager **412** executing at computer system **110**. In some implementations, the version of advertisement manager **412** executing at user device **170** may store the advertisement result information and send it to the version of advertisement manager **412** executing at computer system **110** on a periodic basis and/or when a network connection is available.

In an implementation, advertisement manager **412** may perform statistical analysis of the advertisement result information. Such information may be used to further target relevant advertisements to the user and/or a population of users.

Managing Artist Endorsements

In an implementation, artist endorsement manager **414** may obtain an endorsement of an item (e.g., a product or service) from an artist. The endorsement may be in the form of an identification of the item being endorsed, an identification of an image object in a photograph or other image (e.g., a photograph of an item worn by an artist), and/or other indication of an item being endorsed.



For example, artist endorsement manager **414** may receive a photograph of the artist wearing an item to be endorsed and display the photograph through an interface used by the artist to identify the item. The artist may point to or otherwise indicate the item via the interface. Artist endorsement manager **414** may identify the item based on a bitmap of the photograph or other coordinates of the photograph at which the artist has pointed. Artist endorsement manager **414** may also receive item information such as an name of the item, a price of the item, a manufacturer or retailer of the item, a URL link to a website from which to purchase the item, a link to a redemption page in which the user may redeem one or more loyalty points to obtain the item, and/or other information related to the item.

In an implementation, artist endorsement manager **414** may display, through an ASA of the artist, a photograph of the artist holding/wearing the item in association with a tag. For example, the tag may be overlaid onto, integrated with, or otherwise displayed in association with the photograph. The tag, when clicked or otherwise selected by the user, may cause the ASA to display the item information and/or cause the linked to site (e.g., URL or redemption page) to be displayed.

In some implementations, artist endorsement manager **414** may generate user alerts when an endorsement has been made by the artist. For example, the user may receive an alert that the artist has endorsed an item or cause (e.g., a charity or charitable event). The alert may be associated with content in the ASA.

Fan Boards

In an implementation, fan board manager **416** may obtain aggregate fan information for an artist. The fan information may indicate one or more loyalty items that a given user has accrued. For example, fan information may include a ranking of users based on a number of loyalty items they have accrued. In an implementation, fan board manager **416** may exclude loyalty items that were purchased, thereby providing an indication of actual user activity rather than purchased loyalty items.

In an implementation, the fan information may relate to a particular ASA. In this manner, users of the particular ASA may be ranked with respect to other users of the particular ASA so that the top fans (for example) of a particular artist may be identified. In an implementation, the fan information may relate to multiple ASAs such that users of different ASAs may be ranked with respect to one another so that the top fans (for example) of any artist may be identified. In an implementation, the fan board may relate to a ranking of fans within a particular time period (e.g., top fans within the last month, year, etc.).

In an implementation, the fan information may be displayed as a fan board in an ASA. The fan board may relate to the artist associated with the ASA or may relate to other artists associated with other ASAs.

Discussion Boards

In an implementation, discussion board manager **418** may obtain comments from an artist, users, and/or other entities in relation to an ASA. Discussion board manager **418** may present the comments in a discussion board, which may provide a forum for the artist, users, and others to discuss and share content. Such comments may be input via an ASA, via the command manager, via a website or other interface exposed by the system, and/or other communication channel. The comments may be obtained and displayed in real time through the ASA. In some implementations, the discussion board may be updated periodically.

In some implementations, discussion board manager **418** may analyze the discussion board to parse keywords that may indicate trends, user sentiment (e.g., by comparing words in the discussion board to predefined "happy," "sad," or other sentiment terminologies), and/or other content that may be relevant. In this manner, discussion board manager **418** may mine the discussion boards for relevant information that may assist with marketing, understanding which products/songs/content resonate with users, and/or otherwise gaining insight into user preferences.

Accounting Manager

In an implementation, accounting manager **420** may maintain an artist account used to track funds due to the artist. For example, based on pre-existing agreements between the system operator and the artist (and/or predefined generic agreements), the artist may be entitled to a share of profits resulting from the monetization of the user specific application of the artist. For example, a share of ad income may be provided to the user. As such, accounting manager **420** may track ad revenue (e.g., based on ad displays, click-through-rates, etc.) in order to apportion such revenue to the artist. In some implementations, the system may credit the artist account based on user activity (e.g., the artist may be paid based on a number of downloads, number of users, number of in-app purchases made, affiliation with vendors such as when an artist endorses an item, funds related to cross-selling other applications, share of fees related to data usage from mobile operators, deals involving pre-installation on user devices, etc.).

Cross-Application Functions

In an implementation, cross-application manager **422** may facilitate cross-application functionality. For instance, cross-application manager **422** may obtain, store, or otherwise access content such as music, social media posts, rewards, and/or other information from different ASAs **124**. In this manner, such content may be searched and provided to individual ASAs **124** that may otherwise be unrelated to other ASAs **124**. As such, cross-application manager **422** facilitates a unified ecosystem of different ASAs **124**. Furthermore, cross-application manager **422** may categorize different ASAs **124** into different groups based on musical genres, fan base (e.g., fan demographics), interests, and/or other categorizations, thereby enabling searches for (and discovery of) new and additional artists.

In an implementation, cross-application manager **422** may also support cross-application analytics. For example, cross-application manager **422** may obtain usage and analytics information across different ASAs **124** in order to assess popularity or trends. This may provide artists, studios, an operator of the system, and/or other entities with insight into user interests across a broad spectrum of ASAs **124**.

FIG. **5** illustrates a flow diagram depicting a process **500** for obtaining, storing, and querying content related to different ASAs at a computer system coupled to different ASAs executing at different user devices, according to an implementation of the invention.

In an operation **502**, cross-application manager **422** may obtain first content relevant to a first ASA **124**. In an operation **504**, cross-application manager **422** may obtain second content relevant to a second ASA **124**. The first content and the second content may each include songs, messages, social media content, and/or other content that is relevant to their respective ASAs. For example, cross-application manager **422** may obtain information related to songs of a first artist made available through an ASA of the first artist and information related to songs of a second artist made available through an ASA of the second artist. Likewise, other types of content made available through an ASA may be obtained as well.



In an operation **506**, cross-application manager **422** may compile and index the first content and the second content. For example, the first content and the second content may be stored in a content database.

In an operation **508**, cross-application manager **422** may receive a search request from an ASA (which may be the first ASA, the second ASA, or other ASA) or other source.

In an operation **510**, cross-application manager **422** may search the content database and obtain results based on the search request.

In an operation **512**, cross-application manager **422** may provide the results to the ASA or the other source.

In this manner, cross-application manager **422** may facilitate the search or display of content related to different ASAs by storing or otherwise accessing the content from different ASAs. For instance, a user may execute a search to obtain content related to ASAs, whether or not the user has installed those ASAs. The search results may identify new ASAs that may be of interest to the user, incentivizing the user to download additional ASAs related to other artists. In another example, the user may access a listing of songs of a first ASA from a second ASA. Selection of a song of the first ASA may cause that application to be launched or otherwise cause that application to stream the song to the second ASA). In this manner, the user may need not individually launch different ASAs installed on a user device **170**.

In some implementations, the system may facilitate communication between only certain applications. For instance, a record label may wish for only applications specific to artists signed under its label to be permitted to communicate with one another. Of course, in other more preferred implementations, all ASAs may be permitted to communicate with one another.

As previously noted, the in-stream content management and provisioning platform may be used for various media content of which music from artists is one example. In particular, cross-application functionality described herein may be used in contexts other than music and artists as well. Cross-application manager **422** may manage content from applications that are specific to videos, text, and/or other types of media that is specific to other types of entities (other than artists), items (e.g., products, movies, etc.), and/or other subjects of an entity specific application. For example, and without limitation, television show specific applications may be created in which users may download applications specific to their favorite television shows from one or more networks. Each television show specific application installed on a user device, for example, may share information (e.g., episode listing, outtakes, cast information, etc.) to other applications. Thus, although described in the context of music shared by artists to their fans, the in-stream content management and provisioning platform (e.g., the functions and features of system **100**) described herein may be used to manage other types of content in relation to other entities of subjects of an entity specific application.

FIG. **6** illustrates a flow diagram depicting a process **600** for querying content associated with ASA **124** from user device **170**, according to an implementation of the invention.

In an operation **602**, ASA **124** may obtain one or more search terms relating to a request for information. In an operation **604**, ASA **124** may search content (e.g., songs, social media content, messages, rewards, etc.) associated with the ASA **124**. In an operation **606**, ASA **124** may obtain results based on the search.

In an operation **608**, ASA **124** may determine whether other ASAs on user device **170** should be searched. For example, the request for information may include a parameter that indicates sources that should be queried. Such sources may include, for example, an ASA **124** from which a search was initiated, other ASA **124** installed at user device **170**, other ASAs **124** that are not installed at user device **170** but are available for download, and/or other sources that can be queried for artist-related content.

If other ASAs on user device **170** should be queried, in an operation **610**, ASA **124** may identify other ASAs **124** installed on user device **170**. Such identification may be obtained based on an application registry maintained by an operating system of user device **170**, a registry of installed ASAs **124** that may be stored by each ASA **124** installed on user device **170**, a query to computer system **110**, which may maintain a registry of ASAs **124** installed at a given device, and/or other information source.

In an operation **612**, the identified ASAs **124** may be queried to obtain results therefrom.

In an operation **614**, ASA **124** may determine whether to search remote devices (e.g., content related to ASAs **124** not installed on user device **170**). If yes, ASA **124** may query a remote device (e.g., computer system **110**) in an operation **616** and obtain content based on the querying in an operation **618**. In an operation **620**, ASA **124** may display or otherwise provide the obtained results from the previous operations to the user.

Cross-Application Playlists

In an implementation, playlist manager **424** may allow the creation of a playlist that includes a plurality of songs from different ASAs **124** to be played in a particular order (including a preset or random order). Because a given song may only be played/access from a corresponding ASA **124**, a playlist that includes songs from different ASAs **124** may cause ASAs **124** to be opened or otherwise activated when a song included therein is next in line to be played. ASAs **124** that have already played a song in the playlist may be closed to minimize a memory footprint (or each ASA **124** may remain open but be placed in a de-activated or unfocused state). Alternatively or additionally, playlist manager **424** may cause such opening and closing of ASAs **124** in order to facilitate appropriate monetization by each artist in cases where opening or activating a given ASA **124** contributes to a potential payment to be made to the artist.

A playlist may be used to play songs locally at user device **170**, share the songs with other users (which may encourage the other users to download ASAs **124** included in the playlist that are not already installed at the other users' device), and/or for other purposes.

In an implementation, playlist manager **424** may generate a playlist based on an identification of a set of songs to include in the playlist. For example, the user, artist, or others may specify a playlist of songs to be included in the playlist. A given playlist may include songs from a plurality of different ASAs **124**. Playlist manager **424** may obtain a playlist (e.g., a user may select a playlist to be played) and cause the set of songs to be played.

Table 1 illustrates non-limiting examples of entries in a playlist. Such a playlist may have more (or less) entries, but the illustrated playlist is illustrated with five entries for illustrative purposes. Furthermore, a playlist table may include alternative or additional types of information. The following table is therefore included solely to illustrate aspects of the disclosure and will be described in conjunction with FIGS. **7-11** that follow.



| Playlist position | Application ID | Song ID |
|---|---|---|
| $t_1$ | 1 | SID (1) |
| $t_2$ | 2 | SID (2) |
| $t_3$ | 2 | SID (3) |
| $t_4$ | 3 | SID (4) |
| $t_5$ | 1 | SID (5) |
| . . . | . . . | . . . |
| $t_n$ | N | SID (n) |

As illustrated in Table 1, an entry in the playlist (depicted as a table row) may have an associated playlist position, an application identifier (which identifies a corresponding ASA), and a song identifier (which identifies a song to be played by the corresponding ASA).

FIG. **7** schematically illustrates a non-limiting example of a playlist **700**, according to an implementation. Playlist **700** may include entries **701**, **702**, **703**, **704**, **705**, . . . , (N). Each entry may correspond to a song having a corresponding playlist position $t_{1, 2, 3, 4, 5, \ldots n}$. In this example, which corresponds to Table 1, entries **701**-(N) may each be associated with an Application ID and Song ID. For example, SID (1) may be associated with ASA 1, SID (2) may be associated with ASA 2, SID (3) may be associated with ASA 2, SID (4) may be associated with ASA 3, SID (5) may be associated with ASA 1, and so on and so forth.

A handoff between different ASAs may occur when adjacent songs in the playlist are associated with different ASAs. For instance, a handoff may occur between playlist positions $t_1$ and $t_2$, $t_3$ and $t_4$, and $t_4$ and $t_5$. A handoff may involve opening or otherwise activating the next ASA (which is next in line to play the next song in the playlist) and closing or otherwise de-activating a previous ASA (which completed playing a song in the playlist). For instance, after SID (1) is played, Application ID (also referred to herein and in the Figures as "App ID") 2 (the next ASA) may be opened or otherwise activated while App ID 1 (the previous ASA) may be closed or otherwise de-activated. In some implementations, the previous ASA may not be closed, memory permitting. In some implementations, a certain number of previous or next ASAs may remain open while playing songs of the playlist, which may be subject to memory limits.

The previous ASA may handoff to the next ASA in various ways. For instance, an agent associated with the previous ASA may cause the next ASA to be opened or activated while causing the previous ASA to be closed or de-activated. In some implementations, the previous ASA may cause an operating system of user device **170** to launch the next ASA with a set of launch parameters that includes information that conveys the playlist, including any parameters used to determine what song should be played next. In these implementations, each ASA may parse such launch parameters to determine whether a given song should be played next in relation to the playlist, as well as any handoffs that it should make to other ASAs.

FIG. **8** illustrates a flow diagram depicting a process **800** for switching ASAs to play a playlist, according to an implementation of the invention.

In an operation **802**, playlist manager **424** may obtain a playlist. The playlist may be created by the user, shared to the user, provided to the user by the computer system **110**, and/or other obtained.

In an operation **804**, playlist manager **424** may generate playlist instructions based on the obtained playlist. The playlist instructions may include information that specifies a play-

list such as one illustrated in Table 1. In some implementations, the playlist may be communicated from a first ASA to a second ASA.

Playlist manager **424** may identify the ASA associated with the next song to be played.

In an operation **806**, playlist manager **424** may open/activate the next ASA. In some implementations, the next ASA may be in a closed state and playlist manager **424** may open the next ASA. In some implementations, the next ASA may be running in a deactivated state in the background, and playlist manager **424** may activate the next ASA. As used herein throughout, the term "activate" may include putting into focus or otherwise placing into a state where an ASA may process instructions and play a song.

In an operation **808**, playlist manager **424** may close/deactivate previous ASAs. In some implementations, playlist manager **424** may close/deactivate all the ASAs that were previously opened or activated. In some implementations, playlist manager **424** may selectively close/deactivate one or more artist applications based on the playlist. For example, playlist manager **424** may close the ASAs that do not have more songs to play. In some implementations, playlist manager **424** may keep a certain number of ASAs open/activated, memory permitting.

In an operation **810**, playlist manager **424** may cause the next song to be played. The current ASA may receive the playlist table and, based on the song ID, may identify the song to be played.

In an operation **812**, playlist manager **424** may determine whether the next song to be played is associated with the next ASA (e.g., the application currently open). If yes, playlist manager **424** may cause the next song to be played without opening or activating another ASA in operation **810**. If no, playlist manager **424** may activate/open a next ASA in operation **806**.

It should be noted that the operations of playlist manager **424** as described with respect to FIG. **8** may be included with an ASA **124** (in which case ASA **124** controls playing the playlist) or with platform management application **120** (in which case platform management application **120** controls the ASAs to play the playlist).

FIG. **9** illustrates a flow diagram depicting a process **900** of switching ASAs to play a playlist as controlled locally at a user device, according to an implementation of the invention.

In an operation **1002**, ASA **124** may receive instructions from playlist manager **424** executing at computer system **110**. In an operation **904**, ASA **124** may identify, based on the received instructions, the next song to be played. For example, the instructions may include song ID that identifies the next song. In an operation **906**, ASA **124** may cause the next song to be played. In an operation **908**, ASA **124** may send an indication to playlist manager **424** that the song has been played.

FIG. **10** illustrates a flow diagram depicting a process of switching ASAs to play a playlist, according to an implementation of the invention.

In an operation **1002**, ASA **124** may receive playlist instructions. In an operation **1004**, ASA **124** may identify, based on the received instructions, a song to be played. In operation **1006**, ASA **124** may cause the song to be played. In an operation **1008**, ASA **124** may identify the next song to be played. In an operation **1010**, ASA **124** may determine whether the next song is within the current ASA **124**. If yes, ASA **124** may cause the next song to be played in operation **1006**. If no, ASA **124** may identify the next ASA associated with the next song in an operation **1012**. In an operation **1014**, ASA **124** may pass the instructions to the identified next ASA along with an indication of the next song to be played or may generate and provide a new set of instructions that includes the playlist and the next song to be played.

In some implementations, playlist manager **424** may account for the non-existence of one or more ASAs associated with the playlist. For example, a user may have received a playlist including songs that are associated with ASAs that are not installed on user device **170** of the user. In these implementations, playlist manager **424** may cause any missing ASAs to be installed at user device **170**. In some implementations, such installation may be automatic without user intervention, may be based on input from a user (e.g., after having prompted the user to download any missing ASAs), and/or based on some other trigger.

FIG. **11** illustrates a flow diagram depicting a process **1100** of switching ASAs to play a playlist, according to an implementation of the invention.

In operation **1102**, playlist manager **424** may obtain the playlist as described in various implementations above. In operation **1104**, playlist manager **424** may generate playlist instructions, as described in various implementations above. In operation **1106**, playlist manager **424**, based on the playlist instructions, may identify the current ASA that includes the next song to be played. In operation **1108**, playlist manager **424** may check if the identified current ASA is in the mobile user device. If no, the process moves to operation **1110** in which ASA **124** may be downloaded from the system server. If yes, the process may skip operation **1110** and move to operation **1112**. In operation **1112**, playlist manager **424** may activate/open the current application, as described in various embodiments described above. In operation **1114**, playlist manager **424** may close/deactivate previous applications, as described in various embodiments above. In operation **1116**, playlist manager **424** may pass instructions to the current ASA to play the current song. In operation **1118**, playlist manager **424** may receive an indication that the current song has been played. In operation **1120**, playlist manager **424** may identify the next ASA associated with the next song. In operation **1122**, playlist manager **424** may check whether the next application is same as the current application. If yes, the process moves to operation **1116** in which playlist manager **424** may pass instructions to the current ASA to play the next song. If no, the process moves to operation **1108** in which playlist manager **424** may check if the next application exists in user device **170**.

In some implementations, the user mobile device may be out of memory and may not be able to download one or more ASAs. In such implementations, playlist manager **424** may notify the user that the user mobile device is out of memory. Playlist manager **424** may request the user to clear up the requisite memory and try again. In some implementations, playlist manager **424** may download ASAs **124** as far as the memory can allow. In some implementations, playlist manager **424** may optimize the download based on the memory of the user mobile device. For example, playlist manager **424** may download ASAs **124** that occupy relatively less memory in the user mobile device.

In some implementations, a user may broadcast his/her playlist. For example, a user may share a playlist with his/her friends, with all the users, and/or any other subset of users. In some implementations, playlist manager **424** may receive the playlist and may cause any ASAs associated with the playlist to be installed at user devices with which the playlist have been shared (and which do not have the ASAs already installed).

In some implementations, one or more users may co-listen to a playlist. For example, the user may invite friends to listen

to songs from the playlist, which may be streamed from the user device **170**, from computer system **110**, and/or other device via network **102**. In some implementations, a user with whom the playlist has been shared (and who is co-listening to the playlist) may be invited to download all or a subset of the ASAs associated with the playlist. Responsive thereto, the user may elect to install all or a portion of the ASAs.

As previously noted, the in-stream content management and provisioning platform may be used for various media content of which music from artists is one example. In particular, playlist functionality described herein may be used in contexts other than music and artists as well. Playlist manager **424** may manage playlists related to other types of content such as videos, text, and/or other types of media that is specific to other types of entities (other than artists), items (e.g., products, movies, etc.), and/or other subjects of an entity specific application. For example, and without limitation, movie studios may provide different movie specific applications in which users may download applications specific to their favorite movies. A playlist in the foregoing example may include a series of trailers, movie clips, audio clips, and/or other content made available through movie specific applications, which may be activated or de-activated as described herein. Thus, although described in the context of music shared by artists to their fans, the in-stream content management and provisioning platform (e.g., the functions and features of system **100**) described herein may be used to manage other types of content in relation to other entities of subjects of an entity specific application.

Creating and Managing Dynamic Albums

In an implementation, dynamic album manager **426** may create and maintain one or more dynamic albums. A dynamic album may include a set of songs provided through an ASA **124** installed at user device **170**. The dynamic album may be stored at the user device **170** (e.g., in the manner as described herein with respect to music). Nevertheless, dynamic album manager **426** may modify the set of songs without intervention by the user of user device **170**. Thus, while a user may be able to listen to a dynamic album at the user device **170** even without a network connection, dynamic album manager **426** may maintain control over the dynamic album. In some implementations, the dynamic album may be subject to one or more music leases as described herein.

Dynamic album manager **426** may modify the dynamic album based on one or more album parameters that specify a change to be made to the set of songs. For example, the one or more album parameters specify the removal of one or more songs from the dynamic album, the addition of one or more new songs, the replacement of one or more songs, a rearrangement of (e.g., shuffling) the order of one or more songs, and/or other change to the set of songs.

As used herein and described more fully below, a song that is "added" to a dynamic album may actually be added such that instructions that encode the new song are provided to the ASA, which incorporates the new song into the ASA or otherwise stores the new song such that it is unplayable outside of the ASA. Alternatively, a song may be "added" by merely providing an indication to include a song already stored at the ASA to be added to the dynamic album. Likewise, a song that is "deleted" may actually be deleted or may simply be associated with an indication that indicates that the deleted song should not be played in association with the dynamic album (even though instructions encoding the song remain stored at the ASA).

The album parameters may be specified by an artist via command manager **402** described herein. In this manner, an artist may use the features and functions of a dynamic album to send music and/or other updates to the dynamic album. For example, the artist may introduce new songs, delete old songs, replace one version of a song with another version of the song, present snippets of songs in production, re-arrange an order in which the songs of a dynamic album are played, specify a first song to be played, and/or otherwise change the dynamic album. As another example, the artist may send an audio and/or a video message (e.g., commentary, uncut versions of the song, outtakes, etc.) to be played in association with the dynamic album.

From the user's perspective, the dynamic album may be modified without the user's intervention so that the user may listen to one version of a dynamic album at a first time and listen to another version of the dynamic album at a later time after the dynamic album has been changed by the artist (or other user/entity). In other implementations, the user may be granted some control over whether a dynamic album is updated. Furthermore, in some implementations, the user may be granted control over what songs/music/content is retained by a given ASA **124**. For example, the user may choose to retain only a subset of songs (including only one song) provided by ASA **124**, enabling the user to select songs that the user wishes to retain subject to a music lease.

In some implementations, the dynamic album may start playing when the ASA is launched. For example, a first version of the dynamic album may be played when the ASA is launched at a first time and a second version of the dynamic album may be played when the ASA is launched at a later time after the dynamic album has been changed. In some implementations, the dynamic album may start playing when the user launches (e.g., starts playing) the dynamic album in the ASA.

FIG. **12** illustrates a flow diagram depicting a process **1200** for changing a dynamic album at user devices based on album parameters received from an artist, according to an implementation of the invention.

In an operation **1202**, dynamic album manager **426** may obtain one or more album parameters. For example, dynamic album manager **426** may receive the one or more album parameters from an artist via a communication channel provided by command manager **402**.

In an operation **1204**, dynamic album manager **426** may determine one or more changes to be made to the dynamic album based on the album parameters. For instance, dynamic album manager **426** may identify a new song to be added to the dynamic album, a song to be removed from the dynamic album, and/or otherwise identify one or more changes to be made to the dynamic album.

In an operation **1206**, dynamic album manager **426** may generate album modification information that indicates the changes to be made. The album modification information may include the album parameters and/or otherwise include information that indicates the one or more changes to be applied.

In an operation **1208**, dynamic album manager **426** may transmit the album modification information to the relevant ASA. The ASA may then apply the changes to the dynamic album. In some implementations, such changes are applied without the user's consent or intervention. In other implementations, the ASA provides the user with an opportunity to reject such changes.

Dynamic album manager **426** may identify user devices **170** (e.g., an ASA executing on a user device **170**) to which the album modification information should be provided. For example, first album modification information relating to a first ASA may be provided to user devices **170** that have the first ASA installed thereon, while second album modification

information relating to a second ASA may be provided to user devices **170** that have the second ASA installed thereon.

A user device **170** may be identified based on a communication received from the user device **170** and/or based on a registry of user devices that have downloaded ASAs. An ASA installed on a user device **170** may periodically provide a communication to a version of dynamic album manager **426** executing on computer system **110** (e.g., to request a new music lease or otherwise simply check-in each time the ASA is launched, expressly request the album modification information, etc.). The communication may include information used to identify the user device (e.g., a MAC address), the ASA (e.g., an application identifier, an application version, etc.), and/or other information used to determine that a given ASA is installed at the user device.

Responsive to the communication, dynamic album manager **426** may determine whether album modification information should be provided to the user device **170** (e.g., based on whether the album modification information relates to the ASA that is communicating with dynamic album manager **426**). If so, then dynamic album manager **426** may provide the relevant album modification information to the user device. Other factors may affect the determination of whether to provide the album modification information, such as whether the ASA is using a current version of the dynamic album, as described more fully below.

In an implementation, dynamic album manager **426** may identify one or more user devices that have downloaded the ASA and may push the album modification information to relevant devices. For example, in an implementation, dynamic album manager **426** may query a database that stores indications of devices that have previously downloaded the ASA related to the dynamic album.

In some implementations, the album parameter may indicate a delete operation to delete one or more songs from one or more albums in the ASA. To that end, the dynamic album manager may generate album modification instructions that include the delete operation. Based on the album modification instructions, the dynamic album manager may cause the deletion of one or more songs from the memory of the user mobile device.

In some implementations, the album parameter may indicate an add operation to add one or more songs to one or more albums in the ASA. To that end, the dynamic album manager may generate album modification instructions that include the add operation. Based on the album modification instructions, the dynamic album manager may cause the addition of one or more songs to the memory of the user mobile device.

In some implementations, the album parameter may indicate a replace operation to replace a first song with a second song in one or more albums in the ASA. To that end, the dynamic album manager may generate album modification instructions that include the replace operation. Based on the album modification instructions, the dynamic album manager may cause the replacement of the first song with the second song in the memory of the user mobile device.

In some implementations, the dynamic album manager may generate the album modification instructions to replace a first song with a second song as a combination of delete and add operation, according to the various implementations described above. For example, the album modification instructions may include a delete operation to delete the first song from a dynamic album, and an add operation to add the second song to the dynamic album.

The artist, using the replace operation, may replace a first song in a dynamic album with a second song. For example, the artist may want to replace a song with an entirely different song. As another example, the artist may want to replace a studio-recorded song with a song recorded during a live concert. As another example, the artist may want to replace a short or a trial version of a song with the full version. As another example, the artist may want to replace an older version of the song with a re-mastered, re-conducted, or a re-mixed version of the song,

Alternatives to Actually Adding or Deleting Songs

In some implementations, a version of dynamic album manager **426** (e.g., part of the ASA) executing at a user device **170** may cause the ASA to maintain an album indicator for each of the songs in the dynamic album. The dynamic album manager may cause the ASA to set the album indicators to accomplish various operations included in the album modification instructions.

For example, when the ASA receives album modification instructions to delete one or more songs from the album, the ASA may set the album indicator for the one or more songs to indicate that the one or more songs are not to be played when the dynamic album is played. Alternatively, the ASA may set the album indicator for one or more undeleted songs to indicate that the one or more songs are to be played when the dynamic album is played. Alternatively and/or additionally the ASA may set the indicators for the one or more deleted songs to indicate that the deleted one or more songs are not to be played and to set the indicators for the undeleted one or more songs to indicate that that the undeleted one or more songs are to be played when the dynamic album is played. In some implementations, one or more songs that are indicated not to be played may not be seen by the user of the mobile device. In some implementations, one or more songs that are indicated not to be played may be seen by the user of the mobile device.

As another example, the ASA may receive album modification instructions to add one or more songs to the album. In some implementations, the one or more songs to be added may already be present in the memory of the user device but with its album indicator set to not be played when the dynamic album is played. In these implementations, the ASA may update the album indicator to indicate that the one or more songs are to be played when the dynamic album is played. As such, the version of dynamic album manager **426** executing at computer system **110** may not transmit the one or more songs to be added along with the album modification instructions.

In some implementations, the one or more songs to be added may not exist in the memory of the user mobile device. In such implementations, the one or more songs to be added may be included in or provided together with or separately from the album modification instructions. In such implementations, the ASA may receive the album modification instructions and may add the one or more songs to the memory of the user device **170**.

As another example, the ASA may receive album modification instructions to replace a first song with a second song. The replace operation may be accomplished by a combination of delete and add operations, according to various embodiments described above.

In some implementations, the album indicator may include a binary setting (e.g., a '0' may indicate that the associated song is not to be played when the dynamic album is played and a '1' may indicate that the associated song is to be played when the dynamic album is played). In other implementations, the indicator may be non-binary. The value of the indicator may be used to represent one of several possible states. For example, one value may indicate one or songs to be "not to be played, can be seen by the user" while another value may

indicate one or more songs to be "not to be played, cannot be seen by the user." In some implementations, the indicators may indicate the sequence in which the songs are to be played.

In some implementations, the album modification instructions may indicate a shuffle operation be performed to modify the sequence of songs to be played in the dynamic album. In some implementations, the artist may specify one or more shuffle criteria. For example, the artist may specify that the most recent song has to be played first, followed by the second most recent, and so on. In some implementations, the artist may randomize the order of songs as a shuffle criterion. In some implementations, the shuffle operation may be combined with add, delete, and/or replace operations as described in various implementations above. In some implementations, the shuffle operation may be accomplished by setting the indicators to change the sequence in which the songs are to be played.

As previously noted, the in-stream content management and provisioning platform may be used for various media content of which music from artists is one example. In particular, dynamic album functionality described herein may be used in contexts other than music and artists as well. Dynamic album manager **426** may provide, for example, different movie trailers, clips, and/or other content related to movie specific applications. Thus, although described in the context of music shared by artists to their fans, the in-stream content management and provisioning platform (e.g., the functions and features of system **100**) described herein may be used to manage other types of content in relation to other entities of subjects of an entity specific application.

Dynamic Album Version Control

In some implementations, dynamic album manager **426** may account for different versions of the dynamic album existing on an ASA of a user device **170**. The different versions may result from, for example, user device **170** not receiving an album modification instruction, not applying an album modification instruction, or otherwise being unable to synchronize its version of the dynamic album with the current version. In some implementations, dynamic album manager **426** may obtain the dynamic album version stored at the user device **170** and may compare the obtained version with the current version at computer system **110**. For example, the ASA may provide the dynamic album version to dynamic album manager **426**. Based on the comparison, dynamic album manager **426** may generate and provide album modification instructions to the user device **170** to account for any differences.

FIG. **13** illustrates a flow diagram depicting a process **1300** for accounting for different versions of a dynamic album associated with an ASA at a user device **170**, according to an implementation of the invention.

In an operation **1302**, dynamic album manager **426** may obtain the version of the dynamic album associated with an ASA at user device **170**. In some implementations, dynamic album manager **426** may communicate, to user device **170**, a request to send the version information of a dynamic album. In some implementations, dynamic album manager **426** may receive, from user device **170**, a communication that includes the version information of a dynamic album.

If the version information is received, in an operation **1304**, dynamic album manager **426** may compare the received version with the current version. In an operation **1306**, if the received version is current, processing may loop back to operation **1302** or may terminate. If the received version is not current, in an operation **1308**, dynamic album manager **426** may generate album modification instructions based on the comparison. In some implementations, the album modification instructions may include add, delete, and/or replace operations to account for the difference between the received version and the current version. In some implementations, the modifications instructions may include operations for a complete replacement of the dynamic album at user device **170** with the current version.



In an operation **1310**, dynamic album manager **426** may cause the dynamic album at user device **170** to be modified based on the album modification instructions. In some implementations, dynamic album manager **426** may communicate the album modification instructions to user device **170**. In some implementations, dynamic album manager **426** may access the memory of the user device **170** to modify the dynamic album based on the album modification instructions.

In some implementations, the dynamic album manager **426** may store the differences between the successive versions of the dynamic album. For example, dynamic album manager **426** may store a delta that indicates a change from one version to the next version of the dynamic album. A series of deltas may therefore be applied in order to determine the current state of a dynamic album. Alternatively or additionally, whole copies of a given version of a dynamic album may be stored and marked with a corresponding version identifier.

In some implementations dynamic album manager **426** may receive a communication from user device **170** that indicates the user device does not have enough memory for the modification of the dynamic album. The user may be requested to try again after freeing up the memory required for the update or otherwise additional attempts may be made periodically.

In some implementations, dynamic album manager **426** may receive a communication including an amount of free memory for the dynamic album. In such implementation, dynamic album manager may communicate instructions to user device **170** to provide an option to the user for a partial modification. A partial modification may apply modifications as far as the memory can allow. For example, delete and replace operations, according to various implementations, may be applied but an add operation may not be applied. In some implementations, dynamic album manager **426** may optimize the album modification instructions so that a memory footprint required to carry out the album modification instructions is minimized. For example, delete operations may be performed before add operations.

In some implementations, one or more users of the ASAs may wish to control the modifications to the dynamic albums. To that end, dynamic album manager **426** may cause the ASA to provide options to the user to configure the dynamic modifications. In some implementations, the user may modify the dynamic album manually. In some implementations, the user may allow the modification of dynamic album periodically, for example, once every week, or once every month. In some implementations, the user may want only the "major" modifications, for example, when the artist adds or replaces more than five songs. In some implementations, dynamic album manager **426** may cause the ASA to allow the users to indicate that the one or more songs are not to be replaced or deleted. In some implementations, dynamic album manager **426** may cause modifications to be applied only when the dynamic album is not currently playing.

User Interfaces Provided by an ASA

Having described the various implementations of the system, attention will now be turned to examples of functions and interfaces provided by an ASA. As previously noted, a given ASA may be installed at a user device **170**. An ASA may

include some or all of system instructions **122**. As such, some or all of system instructions **122** may program user device **170** as well.

FIG. **14** illustrates a non-limiting example of a screenshot of a unified player interface **1400** that plays music from an ASA and/or music not associated with the ASA, according to an implementation of the invention.

The screenshot illustrated in FIG. **14** and other drawing figures are for illustrative purposes only. Various components may be added, deleted, moved, or otherwise changed so that the configuration, appearance, and/or content of the screenshots may be different than as illustrated in the figures. Accordingly, the graphical user interface objects as illustrated (and described in greater detail below) are exemplary by nature and, as such, should not be viewed as limiting. Furthermore, as would be appreciated, the various components of unified player interface **1400** may cause certain commands to be performed at or data provided to ASA (e.g., locally at a user device) and/or remote devices such as a computer system **110**.

The unified player interface **1400** may include a section **1402** that displays a plurality of songs that are associated with an ASA (e.g., songs that are not playable outside of the ASA). The songs listed in section **1403** may correspond to an album **1401**. In an implementation, album **1401** includes a dynamic album that may be changed by the artist with or without user intervention as described herein.

The songs in section **1402** may be associated with indicators of popularity (illustrated in FIG. **14** as stars with a corresponding number that indicates a number of users that have “liked” the song). Filled-in stars (or other differentially displayed indicators) may indicate that the user has liked a corresponding song as well.

Section **1404** may display other ASAs installed in user device **170**. Selection of another ASA may cause music from the selected application to be played. In some implementations, such selection may cause the selected application to be launched and its unified player interface to be launched as well, essentially replacing the unified player interface **1400**. In a sense, such selection may cause a handoff from one ASA to another ASA.

In some implementations, sections **1402** and **1404** may together represent a playlist described herein, where different songs from different ASAs in a playlist cause handoffs between ASAs to occur.

Section **1406** may display music that is not associated with an installed ASA. For example, unified player interface **1400** may search for locally stored music and display them for selection in section **1406**. Upon selection of such locally stored music, unified player interface **1400** may play the selected music, delivering a seamless experience for users who have locally downloaded music and ASAs. In some implementations, section **1406** may include streaming music sources as well.

Section **1408** may display controls used to quickly access downloaded songs/ASAs through icon **1408***a*, music playback controls **1408***b*, and messages through icon **1408***c*. Selection of icon **1408***a* may cause the ASA to display a selectable list of ASAs installed at user device **170**. Selection of a downloaded ASA may cause a handoff to that application. Selection of icon **1408***c* may cause the ASA to display alerts or other messages that the user has received.

FIG. **15** illustrates a non-limiting example of a screenshot of an interface **1500** for displaying content updates, according to an implementation of the invention. The interface **1500** may include section **1502** that displays a plurality of updates. In some implementations, the plurality of updates may include an alert for exclusive sound loop. In some implementations, the alert may include instructions to identify the exclusive sound loop existing in the ASA. In some implementations, the alert may include instructions to generate an exclusive sound loop form a combination of various portions of a plurality of songs. For example, an exclusive sound loop may include a combination of chorus from song A, chorus from song B, introduction from song C, and/or any other portions of a plurality of songs. In some implementations, the exclusive sound loop may be received by the ASA in association with the alert.

In some implementations, the plurality of alerts may include an alert inquiring whether the user likes a tune. In some implementations, the alert may include instructions to identify the tune existing in the ASA. In some implementations, the tune may be received by the ASA in association with the alert.

In some implementations, the plurality of alerts may include an alert associated with a sound clip. The sound clip may be received by the ASA in association with the alert. In some implementations, the alert may include an inquiry on whether the user likes the sound clip.

The plurality of alerts may include alerts for photographs, videos, and/or any other content provided to the user.

Section **1510** may also display the date/time when the alert was received. For example, an alert may be received 5 minutes ago, 6 days ago, at a certain date, and/or any other date/time. Section **1510** may also display the number of times the alert has been dubbed a favorite, indicated by the number of stars. The dark stars may indicate that the user has tagged the alert as a favorite, and the white stars may indicate that the user has not tagged the alert as a favorite.

FIG. **16** illustrates a non-limiting example of a screenshot of an interface **1600** for displaying a plurality of menu icons associated with an ASA, according to various implementations.

Menu icon **1601** may display the number of alerts **1601***a* the user has received. Selecting the menu icon **1601** may cause the ASA to display interface **1700** that displays messages.

Menu icon **1602** may be associated with a loyalty item such as a “heart” as illustrated. Selecting the menu icon **1602** may cause the ASA to display a number of loyalty items accrued by the user.

Selecting the menu icon **1603** may cause the ASA to display interface **1800** that displays rewards available for redemption. Menu icon **1604** may display the number of ASAs **1604***a* installed at user device **170**. Selecting the menu icon **1604** may cause the ASA to display ASAs installed at user device **170**. The ASA may allow the user to switch to one of the other ASAs, which may cause a handoff to occur.

Selecting menu icon **1605** may cause the ASA to display playlists described herein. In some implementations, selecting menu icon **1605** may cause the ASA to display unified player interface **1400**.

Selecting the menu icon **1606** may cause the ASA to display the website of the associated with an operator of the system. Selecting the menu icon **1607** may cause the ASA to display achievements such as badges accrued by the user. Selecting the menu icon **1608** may cause the ASA to display a fan board interface **1900** that display a fan board.

Selecting the menu icon **1609** may cause the ASA to display the purchases made by the user from one or more ASAs and/or interface **1800**. Selecting the menu icon **1610** may cause the ASA to display a log in interface for the user to log into the ASA.

Although described with respect to icons that represent various other interfaces, the various interfaces described

herein may be navigated by swiping a touchscreen (or performing another user interface action) to scroll through the various interfaces.

FIG. **17** illustrates a non-limiting example of a screenshot of an interface **1700** for displaying messages received by the user, according to an implementation of the invention. Section **1702** may display details of a message. Section **301** may include a number of input methods to create a message, such as an icon **304** that represents a text input, an icon **305** that represents an image/camera input, or an icon **306** that represents a voice input. Other types of input may be used as well. Icon **303** may allow the user to transmit a message (whether text, image, audio, and/or other format) to the artist (or other users).

FIG. **18** illustrates a non-limiting example of a screenshot of an interface **1800** that facilitates redemption of one or more loyalty points for a reward, according to an implementation of the invention. The interface **1800** may include a plurality of sections **401**, **402**, **403**, **404**, **405**, and **406** that each displays information associated with an individual reward. Within a given section may display an avatar (e.g. a picture, image, and/or other representation) associated with the reward, a name of the reward, a description of the reward, and a number of loyalty points required to obtain the reward.

FIG. **19** illustrates an example of the fan board display **1900**, according to an implementation of the invention. The exemplary fan board display facilitates the user to see the aggregate fan information of the artist associated with the ASA.

The fan board display **1900** may include the top fans of the artist based on the aggregate fan information. In some implementations, the fan board manager may communicate to the system server, the user activities associated with an ASA. The system server may use the information on the user activities to generate the fan boards.

FIG. **20** illustrates a non-limiting example of a screenshot of an interface **2000** for displaying the discussion board to which users and the artist may post messages, including content such as music, according to an implementation of the invention. The interface may include an avatar **2001** (e.g. a picture, image, and/or other representation) associated with the artist, a message **2002** from the artist, a comment window **2003** for the user to provide a comment, and a feed **2004** of messages made by users and replies/comments by the artist.

FIG. **21** illustrates a non-limiting example of a screenshot of an interface **2100** for displaying the affiliation of the artist with one or more merchandise items, according to an implementation of the invention. The interface **2100** may include a merchandise tag **2102** associated with an image **2101** of the artist holding/wearing the merchandise item. Upon selection of merchandise tag **2102**, information related to the tagged merchandise (e.g., manufacturer, style, color, size, etc.) may be displayed and/or an interface to purchase the tagged merchandise may be displayed.

FIG. **22** illustrates a non-limiting example of a screenshot of an interface **2200** for displaying non-intrusive targeted advertisements in the ASA, according to an implementation of the invention. Interface **2200** may include a plurality of advertisement icons **2202** presented as favorite sites of the artist. The advertisement icons may include links to downloads of other ASAs. Selecting an icons associated with another ASA may cause the other ASA to be downloaded. Interface **2200** may also include a plurality of icons **2203** for social media that is of interest to the artist. Selecting on an icon may cause the ASA to display the respective social media feed.



In some implementations, interface **2200** may include a search window **801** that receives search input to search for content within the ASA, other ASAs, and/or remote devices (e.g., other user devices **170**, computer system **110**, etc.).

Computer system **110** and user devices **170** may each include, without limitation, server devices (e.g., server blades), desktop computers, laptop computers, tablet computers, mobile computers (e.g., smartphones), dedicated media player devices, and/or device that may be programmed with the various computer program instructions described herein (e.g., platform management application **120**, system instructions **122**, ASAs **124**, etc.).

Although illustrated in FIG. **1** as a single component, computer system **110** may include a plurality of individual components (e.g., computer devices) each programmed with at least some of the functions described herein. In this manner, some components of computer system **110** may perform some functions while other components may perform other functions, as would be appreciated. The one or more processors **112** may each include one or more physical processors that are programmed by computer program instructions. The various instructions described herein are exemplary only. Other configurations and numbers of instructions may be used, so long as the processor(s) **112** are programmed to perform the functions described herein.

Furthermore, it should be appreciated that although the various instructions are illustrated in FIG. **1** as being co-located within a single processing unit, in implementations in which processor(s) **112**, **172** includes multiple processing units, one or more instructions may be executed remotely from the other instructions.

The description of the functionality provided by the different instructions described herein is for illustrative purposes, and is not intended to be limiting, as any of instructions may provide more or less functionality than is described. For example, one or more of the instructions may be eliminated, and some or all of its functionality may be provided by other ones of the instructions. As another example, processor(s) **112**, **172** may be programmed by one or more additional instructions that may perform some or all of the functionality attributed herein to one of the instructions.

The various instructions described herein may be stored in a storage device **114**, **174** which each may comprise random access memory (RAM), read only memory (ROM), and/or other memory. The storage device may store the computer program instructions (e.g., the aforementioned instructions) to be executed by processor **112**, **172** as well as data that may be manipulated by processor **112**, **172**. The storage device may comprise floppy disks, hard disks, optical disks, tapes, or other storage media for storing computer-executable instructions and/or data.

The various components illustrated in FIG. **1** may be coupled to at least one other component via network **102**, which may include any one or more of, for instance, the Internet, an intranet, a PAN (Personal Area Network), a LAN (Local Area Network), a WAN (Wide Area Network), a SAN (Storage Area Network), a MAN (Metropolitan Area Network), a wireless network, a cellular communications network, a Public Switched Telephone Network, and/or other network. In FIG. **1** and other drawing Figures, different numbers of entities than depicted may be used. Furthermore, according to various implementations, the components described herein may be implemented in hardware and/or software that configure hardware.

The various databases **130** described herein may be, include, or interface to, for example, an Oracle™ relational database sold commercially by Oracle Corporation, MySQL,

SYBASE, Informix™, DB2 (Database **2**) or other data storage, including file-based, or query formats, platforms, or resources such as OLAP (On Line Analytical Processing), SQL (Structured Query Language), a SAN (storage area network), Microsoft Access™ or others may also be used, incorporated, or accessed. The database may comprise one or more such databases that reside in one or more physical devices and in one or more physical locations. The database may store a plurality of types of data and/or files and associated data or file descriptions, administrative information, or any other data.

Other implementations, uses and advantages of the invention will be apparent to those skilled in the art from consideration of the specification and practice of the invention disclosed herein. The specification should be considered exemplary only, and the scope of the invention is accordingly intended to be limited only by the following claims.

What is claimed is:

**1**. A computer implemented method for updating a dynamic album that includes a set of songs stored in relation to and played by an artist specific application associated with an artist, the method being implemented on a user device having one or more physical processors programmed with computer program instructions that, when executed by the one or more physical processors, cause the user device to perform the method, the method comprising:

receiving, by the user device, one or more album parameters that specify a change to be made to the dynamic album that includes a plurality of songs, wherein the dynamic album is stored via information encoding the plurality of songs at the user device in association with the artist specific application that plays the dynamic album at the user device;

accessing, by the user device, the information encoding the plurality of songs responsive to receipt of the one or more album parameters;

modifying, by the user device, the information encoding the plurality of songs based on the one or more album parameters to change the dynamic album without intervention by a user of the user device;

storing, by the user device, the modified information encoding the plurality of songs at the user device; and

playing, by the user device, at least some of the dynamic album through the artist specific application based on the modified information encoding the plurality of songs at the user device.

**2**. The method of claim **1**, wherein the one or more album parameters originate from the artist associated with the artist specific application to change the dynamic album for users that have installed the artist specific application.

**3**. The method of claim **1**, wherein the information encoding the plurality of songs is integrated with an executable file associated with the artist specific application.

**4**. The method of claim **1**, wherein the one or more album parameters specify a new song to be added to the dynamic album, the method further comprising:

receiving information that encodes the new song, wherein modifying the information encoding the plurality of songs comprises re-encoding the information encoding the plurality of songs such that the new song is included in the dynamic album.

**5**. The method of claim **1**, wherein the one or more album parameters specify a song to be removed from the dynamic album, the method further comprising:

omitting the song to be removed during playback of the dynamic album.



**6**. The method of claim **5**, wherein omitting the song to comprises deleting the song.

**7**. The method of claim **5**, wherein omitting the song comprises updating an indicator associated with the song to be removed to indicate that the song should not be played in association with the dynamic album.

**8**. The method of claim **1**, wherein the one or more album parameters specify a song to be replaced with a replacement song, the method further comprising:

causing the replacement song to be played instead of the song to be replaced during playback of the dynamic album.

**9**. The method of claim **8**, wherein the replacement song comprises a different version of a song to be replaced.

**10**. The method of claim **1**, wherein the one or more album parameters specify a reshuffling of the dynamic album, the method further comprising:

changing an order in which the plurality of songs of the dynamic album is played based on the one or more album parameters.

**11**. The method of claim **1**, wherein the plurality of songs is playable at the user device through only the artist specific application.

**12**. The method of claim **1**, wherein the dynamic album is subject to a music lease that, when expires, renders the dynamic album unplayable, the method further comprising:

determining whether the music lease has been expired; and

rendering the dynamic album unplayable responsive to a determination that the music lease has expired.

**13**. The method of claim **1**, the method further comprising:

initiating playback of the dynamic album upon initiation of the artist specific application.

**14**. A system for updating a dynamic album that includes a set of songs stored in relation to and played by an artist specific application associated with an artist, the system comprises:

a user device comprising one or more physical processors programmed with computer program instructions that, when executed by the one or more physical processors, cause the user device to:

receive one or more album parameters that specify a change to be made to the dynamic album that includes a plurality of songs, wherein the dynamic album is stored via information encoding the plurality of songs at the user device in association with the artist specific application that plays the dynamic album at the user device;

access the information encoding the plurality of songs responsive to receipt of the one or more album parameters;

modify the information encoding the plurality of songs based on the one or more album parameters to change the dynamic album without intervention by a user of the user device;

store the modified information encoding the plurality of songs at the user device; and

play at least some of the dynamic album through the artist specific application based on the modified information encoding the plurality of songs at the user device.

**15**. The system of claim **14**, wherein the one or more album parameters originate from the artist associated with the artist specific application to change the dynamic album for users that have installed the artist specific application.

**16**. The system of claim **14**, wherein the information encoding the plurality of songs is integrated with an executable file associated with the artist specific application.

**17**. The system of claim **14**, wherein the one or more album parameters specify a new song to be added to the dynamic album, the user device further programmed to:

receive information that encodes the new song, wherein modifying the information encoding the plurality of songs comprises re-encoding the information encoding the plurality of songs such that the new song is included in the dynamic album.

**18**. The system of claim **14**, wherein the one or more album parameters specify a song to be removed from the dynamic album, wherein the user device is further programmed to:

omit the song to be removed during playback of the dynamic album.

**19**. The system of claim **18**, wherein to omit the song, the user device is further programmed to delete the song.

**20**. The system of claim **18**, wherein to omit the song, the user device is further programmed to:

update an indicator associated with the song to be removed to indicate that the song should not be played in association with the dynamic album.

**21**. The system of claim **14**, wherein the one or more album parameters specify a song to be replaced with a replacement song, the user device further programmed to:

cause the replacement song to be played instead of the song to be replaced during playback of the dynamic album.

**22**. The system of claim **20**, wherein the replacement song comprises a different version of a song to be replaced.

**23**. The system of claim **14**, wherein the one or more album parameters specify a reshuffling of the dynamic album, wherein the user device is further programmed to:

change an order in which the plurality of songs of the dynamic album is played based on the one or more album parameters.

**24**. The system of claim **14**, wherein the plurality of songs is playable at the user device through only the artist specific application.

**25**. The system of claim **14**, wherein the dynamic album is subject to a music lease that, when expires, renders the dynamic album unplayable, wherein the user device is further programmed to:

determine whether the music lease has been expired; and

render the dynamic album unplayable responsive to a determination that the music lease has expired.

**26**. The system of claim **14**, wherein the user device is further programmed to:

initiate playback of the dynamic album upon initiation of the artist specific application.

**27**. A computer implemented method for receiving commands from an artist to update a dynamic album at a user device that includes a set of songs stored in relation to and played by an artist specific application associated with the artist, the method being implemented on a computer system having one or more physical processors programmed with computer program instructions that, when executed by the one or more physical processors, cause the computer system to perform the method, the method comprising:

receiving, by the computer system, from the artist, one or more commands that specify a change to be made to the dynamic album played at the user device through the artist specific application associated with the artist;

generating, by the computer system, one or more album parameters used to change the dynamic album based on the one or more commands; and

providing, by the computer system, the one or more album parameters to at least the user device remote from the computer system at which the artist specific application is installed, wherein the one or more album parameters cause the user device to change the dynamic album in association with the artist specific application without intervention by a user of the user device.

**28**. The method of claim **27**, wherein providing the one or more album parameters to the user device comprises:

identifying the user device based on identifying information used to identify the user device, wherein the one or more album parameters are provided based on the identification.

**29**. The method of claim **28**, wherein the identifying information comprises a user account identifier that is associated with the user device.

**30**. The method of claim **27**, wherein the one or more album parameters is provided to the user device responsive to a communication received from the first user device.

* * * * *